[Crim. No. 7824. In Bank. Nov. 30, 1964.]

In re HORACE H. HUBBARD et al. on Habeas Corpus.

Burton Marks for Petitioners.

James T. Starr, City Prosecutor (Long Beach), Carl T. Zeiger, Chief Deputy Prosecutor, and Leonard Putnam, City Attorney, for Respondent.

M. Tellefson as Amicus Curiae on behalf of Respondent.

PETERS, J.—Horace H. Hubbard, Jack J. Gerard, Jack Soglofsky, Tillie Oberman, Floyd D. Thogmartin, and Hal Miller (hereinafter referred to as ''defendants'') were arrested on a charge of violating section 4140.7 of the Long Beach Municipal Code.[1] The specifications of the charge were that defendants had been playing, for money, and within the city limits of Long Beach, a game of chance played with cards, and known as panguingui. Assuming, without deciding, that panguingui is a game of chance, it is one of the games prohibited by the terms of the ordinance, but is not a ''banking or percentage game,'' as that phrase is used in section 330 of the Penal Code.[2]

Defendants, who pleaded not guilty, are free on bail awaiting trial.[3] The present petition has been filed for the purpose of testing the validity of the ordinance under which they were arrested and charged. They attack the ordinance on the dual grounds that: (1) the phrase ''game of chance'' as used therein is so vague as to render the ordinance invalid, and (2) it is unconstitutional and void because the state Legislature has preempted the field of gambling.

---

[1]Section 4140.7 reads: ''No person shall play or bet at, or as owner or employee open, deal, play, carry on or conduct any game of chance played with cards, dice, balls, pins, checkers, counters, quoits, beans, spindles, tables, wheels, machines, or any other device, contrivance or apparatus, or with any combination of any thereof, for money, checks, or other representative of value.''

[2]Section 330 provides, in part: ''Every person who deals, plays, or carries on, opens, or causes to be opened, or who conducts, either as owner or employee, whether for hire or not, any game of faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fan-tan, stud-horse poker, seven-and-a-half, twenty-one, hokey-pokey, or any banking or percentage game played with cards, dice, or any device, for money, checks, credit, or other representative of value, and every person who plays or bets at or against any of said prohibited games, is guilty of a misdemeanor, . . .''

[3]The fact that defendants are not in actual physical custody is not material to their right to seek a writ of habeas corpus (*In re Petersen,* 51 Cal.2d 177 [331 P.2d 24]).

*The ordinance is not vague:*

 Defendants contend that the phrase ''game of chance'' is insufficient to advise a person of common and ordinary intelligence what games are prohibited and what games are permitted under the ordinance. If this were so, the ordinance would be void for uncertainty. (*In re Newbern,* 53 Cal.2d 786 [3 Cal.Rptr. 364, 350 P.2d 116]; *People* v. *McCaughan,* 49 Cal.2d 409 [317 P.2d 974]; *In re Blaney,* 30 Cal.2d 643 [184 P.2d 892].) However, the quoted phrase is not of the character claimed. This was impliedly recognized in the case of *In re Allen,* 59 Cal.2d 5 [27 Cal.Rptr. 168, 377 P.2d 280]. There the propriety of an arrest under a Los Angeles County gambling ordinance similar in its language to the one here involved, was considered. There, also, the ordinance purported to prohibit certain activities in connection with a ''game of chance.'' It is true that the ordinance was not attacked on the ground of lack of clarity, so that the precise point here involved was not passed upon expressly. The contention there was that the game of bridge (the activity for which the defendant was arrested) was not a game of chance and therefore not prohibited by the ordinance. In approving defendant's contention in that respect the court stated (p. 6):

''The term 'game of chance' has an accepted meaning established by numerous adjudications. Although different language is used in some of the cases in defining the term, the definitions are substantially the same. It is the character of the game rather than a particular player's skill or lack of it that determines whether the game is one of chance or skill. The test is not whether the game contains an element of chance or an element of skill but which of them is the dominating factor in determining the result of the game. [Citations.]''

The opinion also pointed out that although in every card game there is an element of chance resulting from the deal of the cards, the play of each hand of bridge is predominantly a test of skill. From this discussion it would seem quite apparent that persons of ordinary intelligence should know what is and what is not a ''game of chance.'' One who intends to play any given game must be presumed to know the basic rules and character thereof. He is thus able to determine in advance whether chance or skill is the ''dominating factor in determining the result of the game.'' If the former dominates, the ordinance prohibits playing such game for ''money, checks, or other representative of value.'' In all other cases the ordinance does not purport to prohibit play.

In the present case, we are not called upon to determine whether panguingui is a game of chance or one of skill. That question has not been made an issue herein. It will be decided at the trial. The controlling point is that the ordinance sets forth in clear terms just what type of game is prohibited, and under what circumstances. It is not, therefore, void for uncertainty or vagueness.

## The issue of preemption:

Defendants' principal contention is that the entire field of gambling has been preempted by state law, leaving no room for further legislation by local authorities. That preemption, they argue, is to be found in Penal Code section 330, *supra*, footnote 2.[4] That statute forbids playing, ''for money, checks, credit, or other representative of value,'' as well as betting at or against any of 12 expressly enumerated games together with any banking or percentage game. Panguingui is not one of the 12 games expressly prohibited and, as stated above, is not a banking or percentage game. The parties agree that playing or gambling at panguingui is not expressly within the prohibitions of section 330. But, of course, that fact alone does not determine the claim of state preemption. Defendants' argument, fundamentally, is that Penal Code section 330 should be interpreted as containing a legislative finding that only those forms of gaming expressly prohibited are inherently dangerous to public morals, and that those which are not enumerated have been found by the Legislature to constitute no evil, and beyond the scope of local regulation. On the other hand, respondent contends that the specific enumeration of several games, types of gaming, and other forms of gambling, excludes the possibility of an intent to legislate on any other, thus leaving those forms not prohibited to be dealt with under

[4]Section 330 is a portion of chapter 10 of title 9 of part 1 of the Penal Code, all of which is devoted to the subject of gambling. Other sections prohibit slot machines and similar mechanical devices (§§ 330a through 335a), make it an offense to permit minors to play at any game of chance in a saloon (§ 336), authorize counties with a population exceeding 4,000,000 to regulate or prohibit draw poker, and prohibit sending a minor or soliciting the entry of any person into a gambling house. In addition to the concept of gaming, state law prohibits and controls many other forms of gambling. The same chapter of the Penal Code implements the constitutional provisions regarding horse racing by prohibiting bookmaking and otherwise placing controls on betting at race tracks (Pen. Code, §§ 337a-337h), or other sporting events (§§ 337b-337e). Section 26 of article IV of the Constitution requires the Legislature to enact laws prohibiting lotteries, which it has done via chapter 9 of title 9 of part 1 (§§ 319-326) of the Penal Code. Betting on a boxing match is prohibited by Penal Code section 412, which is a portion of title 11 of part 1.

the provisions of section 11 of article XI of the California Constitution. That section provides:

"Any county, city, town, or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws."

Respondent, the Chief of Police of Long Beach, also relies on section 6 of article XI (and also section 8 containing a similar provision) which provides that chartered cities, such as the City of Long Beach, may "make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws."

In view of these constitutional provisions, defendants' claim of state preemption must be tested against two separate concepts. The first involves the question whether there is a "conflict" between the city ordinance and the general laws, as that term is used in section 11 of article XI. The second arises from the allegedly exclusive power of a charter city to "make and enforce all laws and regulations in respect to municipal affairs," as that phrase is used in section 6.

So far as the first problem is concerned, it is clear that the regulation of gambling in any form is within the purview of local police power. Defendants do not challenge this. The ordinance, therefore, is valid if not in "conflict" with general law. Obviously, there is no grammatical conflict, since the ordinance does not purport to prohibit or regulate the listed games prohibited by Penal Code section 330. The general terms of the ordinance may include some of the forms of gaming enumerated in the code section, but its obvious intent is to prohibit an entire class of gaming (games of chance) not mentioned in the state regulation. It is simply an attempted use of the police power in regard to a subject on which the state has enacted some legislation. There are many situations wherein municipal police power may operate on the same subject matter embraced in state legislation. This is particularly true when the local regulations purport only to supplement the general by additional reasonable requirements, or are in aid and furtherance thereof (*Pipoly* v. *Benson*, 20 Cal.2d 366, 370 [125 P.2d 482, 147 A.L.R. 515], and cases cited therein). The courts of this state have held on many occasions that local ordinances similar to the one now under review, insofar as they applied to games not enumerated in Penal Code section 330, were not in conflict with state law. (*In re Murphy*, 128 Cal.

29 [60 P. 465]; *In re Portnoy,* 21 Cal.2d 237 [131 P.2d 1]; *Remmer* v. *Municipal Court,* 90 Cal.App.2d 854 [204 P.2d 92]; *In re Farrant,* 181 Cal.App.2d 231 [5 Cal.Rptr. 171].) However, the rule on which those authorities are predicated is subject to the exception that local government may not enact additional requirements in regard to a subject matter which has been *fully* occupied by general state law (*Pipoly* v. *Benson, supra,* 20 Cal.2d 366, 370; *Agnew* v. *City of Los Angeles,* 51 Cal.2d 1 [330 P.2d 385]; *Abbott* v. *City of Los Angeles,* 53 Cal.2d 674, 681 et seq. [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385]). We must, therefore, hold (insofar as the first question is concerned) that section 4140.7 of the Long Beach Municipal Code is a valid exercise of local police power unless the state has fully occupied (i.e., preempted) the field in which it purports to operate.

In order to determine this question the ''field'' involved should first be defined. As shown above (fn. 4), the general law consists of a series of prohibitory enactments covering many aspects of gambling. Do those many statutes constitute a full occupation of the entire subject matter of gambling, in its varied forms? Or is the ''field'' which we are asked to find preempted by the state limited to the subject of ''gaming''; i.e., participation in games played with cards, dice or other device, such as are ordinarily played for money or other evidence of value? A third possibility is that the field should be defined in such a manner as to be limited to participation in ''banking or percentage'' games.

■ The contention that the Legislature intended to occupy the entire field of gambling is without merit. Although the various code sections above referred to are extensive in their scope, they are far from being all inclusive. While they may include complete regulation of horse racing and prize fighting, and certainly prohibit all forms of lottery and some forms of gaming, they certainly do not prohibit all forms of gambling. Draw poker, in some situations, is expressly left to local option. We are not aware of any state legislation which purports to prohibit private betting on the outcome of a future event (certainly a form of gambling), other than in regard to elections, boxing, horse racing, or other sporting events. There are any number of other forms of gambling which the general laws do not regulate or prohibit. It follows that the state has not preempted the field, if the subject matter thereof be deemed to be gambling in general.

■ Turning directly to the contention that the state has occupied the entire field of gaming, there is strong evidence

that this was not the legislative intent. Section 330, the principal statute on the subject, prohibits 12 specific games, as well as any "banking or percentage" game. If the Legislature had intended to regulate the play of any game which is ordinarily played for money or other evidence of value, it would have been very simple to say just that. Not only did the Legislature fail to use the all inclusive phrase, but by other legislation it clearly indicated that it recognized the existence of other gambling games not included in the prohibition of the code section. Section 332, enacted the same year as section 330, makes it a crime to win money by cheating while playing or betting on *any* game. Reading the two sections together, it becomes obvious that 330 was intended to ban betting or wagering only in regard to a limited number of games. Likewise, section 336, among other things, makes it a misdemeanor to permit any person under the age of 21 "to play at any game of chance" in a saloon or drinking place. The quoted phrase indicates a legislative recognition of the distinction between the specifically enumerated games and class of games prohibited in their entirety by section 330, and other games of chance. As to the latter, the regulation is limited to the protection of minors.

A further indication that the general laws were not intended to regulate all wagering in regard to games is found in that body of law dealing with games of skill. On many occasions the courts have been called upon to determine whether a local ordinance which prohibits wagering on any game of chance is broad enough to cover the act of wagering on one's own ability in a game of skill. The most recent and definitive case on that subject is *In re Allen, supra,* 59 Cal.2d 5, where it was held that the playing of or wagering on the game of bridge [so long as the bets are not based upon another person's skill or ability] does not constitute wagering on a game of chance. While the precise point was not presented, there is a strong inference in that case, as already pointed out, that the state law does not cover the subject of games of skill.

Since the general laws do not make illegal all forms of gambling, or even all forms of gaming, they cannot be said to occupy either field to the exclusion of the exercise of local police power, unless we adopt the negative type of argument inherent in defendants' contention, that is, that by making specific acts illegal the Legislature intended all other acts of similar character to be of such innocent character that no local authority might adopt a contrary view. To adopt such a view (for which no authority has been presented) would be to fly in the face of the well-settled doctrine that the use of specific

words and phrases connotes an intent to exclude that which is not specifically stated. By limiting the general statutes to regulation or prohibition of specifically enumerated activities, the Legislature did not intend to prevent local authority from legislating on those subjects in regard to which the former are silent. It follows that the state has not occupied the entire field of gambling or gaming to the extent that the general laws conflict with an ordinance regulating "games of chance."

We turn now to the impact of the general laws on the constitutional right of a chartered city to "make and enforce all laws and regulations in respect to municipal affairs." Although the parties argue this issue as one of state preemption, it is not, strictly speaking, predicated on full occupation of the field. The exclusive right of a chartered city or county to regulate turns on whether or not the subject matter is a municipal affair. In other words, if it is exclusively a matter of state concern, chartered cities have no authority to act at all. (See *Professional Fire Fighters, Inc.* v. *City of Los Angeles*, 60 Cal. 2d 276, particularly fn. 11 at pp. 292-293 [32 Cal.Rptr. 830, 384 P.2d 158].) Of course, a particular subject may be both a municipal affair and of statewide concern. Since the question whether the subject is of state concern is often determined by whether or not the state has enacted legislation, preemption or full occupation of the field may become one, but only one, test of whether the given subject is a municipal affair. With these concepts in mind, it has been held that a chartered city or county may not legislate in regard to those matters covered by general law if (a) the local legislation attempts to impose additional requirements (*In re Lane*, 58 Cal.2d 99 [22 Cal.Rptr. 857, 372 P.2d 897]), or (b) the subject matter is one of state concern, and the general law occupies the entire field (*Pearson* v. *County of Los Angeles*, 49 Cal.2d 523, 535 [319 P.2d 624]), or (c) the subject matter is of such statewide concern that it can no longer be deemed a municipal affair (*Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra*, 60 Cal.2d 276). These rules may be somewhat confusing because they give no guide as to what is and is not a matter of state concern. Respondent frankly admits that the constitutional concept of municipal affairs, as distinct from matters of state concern, is not a fixed or static concept, but claims it may change with changing conditions (citing *Pacific Tel. & Tel. Co.* v. *City & County of San Francisco*, 51 Cal.2d 766 [336 P.2d 514]). How then, he asks, shall a chartered city be advised

whether a particular subject is of such statewide concern as to prevent it from being considered a municipal affair?

This question must be answered in the light of the facts and circumstances surrounding each case. This does not mean that there are no standards which a chartered city or county may apply when attempting to determine its right to legislate in a specific field. ■ Analysis of the many prior decisions on this subject indicates that although the language differs from case to case, the rationale of all have one thing in common, that is, that chartered counties and cities have full power to legislate in regard to municipal affairs unless: (1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.

■ Tested by such rules, section 4140.7 of the Long Beach Municipal Code is seen to be a regulation of a municipal affair, and not exclusively a matter of statewide concern. As already indicated, the subject matter has not been fully and completely covered by general law (except insofar as the ordinance may be applied to the 12 games and one class of activity prohibited by Penal Code section 330). There is nothing in the general laws which indicates a state concern regarding the regulation of such games of chance as are not expressly prohibited by those statutes. Finally, regulation of gaming and gambling establishments is not a matter in which transient citizens of the state are peculiarly concerned, as they are or might be in regulation of traffic or registration of criminals. Thus, the ordinance is valid.

The order to show cause is discharged, and the petition for a writ of habeas corpus is denied.

Traynor, C. J., Tobriner, J., and Peek, J., concurred.

McComb J., and Schauer, J.,* concurred in the judgment.

Petitioners' application for a rehearing was denied December 23, 1964. Burke, J., did not participate therein.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.