[S.F. No. 24588. July 26, 1984.]

THE PEOPLE ex rel. GEORGE DEUKMEJIAN,
as Attorney General, etc., Plaintiff and Respondent, v.
COUNTY OF MENDOCINO et al., Defendants and Appellants.
PROPONENTS OF THE INITIATIVE et al., Interveners and Appellants.

478

COUNSEL

John A. Drummond and H. Peter Klein, County Counsel, Stephen D. Underwood and Ronald R. Ball, Deputy County Counsel, for Defendants and Appellants.

Vogel & Rosen, Barry Vogel, Laurens H. Silver, Douglas L. Honnold, Stark, Stewart, Wells & Robinson, Phillip S. Berry, Berry & Berry, Wesley R. Higbie and Henrickson Higbie, Mingst & Cole for Interveners and Appellants.

George Deukmejian and John K. Van de Kamp, Attorneys General, R. H. Connett, Assistant Attorney General, Allene C. Zanger and M. Anne Jennings, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BROUSSARD, J.**—In this action for declaratory and injunctive relief, the trial court determined that a Mendocino County initiative ordinance prohib-

iting aerial application of phenoxy herbicides was preempted by state law and therefore invalid. The court entered summary judgment for plaintiff, the State of California. The county and a number of interveners appeal.[1]

In 1977 a forest products company sprayed a 500-acre tract with Phenoxy Herbicides. The drift from the spraying extended nearly three miles from the spray location, and school buses from two different school districts were sprayed. There was a public outcry, and local residents commenced a campaign to prevent the aerial spraying of Phenoxy Herbicides.

In June 1979, the voters of Mendocino County approved an initiative measure prohibiting the aerial application in the county of phenoxy herbicides, including, but not limited to, 2,4,5-T, Silvex, 2,4-D and any matter containing the chemical Dioxin. The ordinance contains an explanation of its purpose: "We find and declare that it is necessary to prohibit the aerial application of phenoxy herbicides because of the dangers of drift, contamination of food and water, and irrevocable harm to natural resources. The aerial application of phenoxy herbicides, in light of said dangers, threatens the right of the people of Mendocino County to be secure in their homes and to enjoy the peaceful, undisturbed use of private property and public lands." Violation of the ordinance is a misdemeanor.

The ballot argument in favor of the ordinance states that phenoxy herbicides are a public health hazard known to cause birth defects, miscarriages and cancer. Phenoxy herbicides are plant growth regulators, principally used as weed killers. Phenoxy herbicide is primarily used in this state for killing weeds which threaten cereal crops, rice, wheat, barley, oats and corn. Approximately 2.5 percent is used for commercial timberland to retard hardwood growth in favor of conifer growth during reforestation. Use on pasture, rangeland and rights of way account for most of the rest. (See Cal. Dept. of Food & Agr., Pesticide Use Annual Rep. (1982) pp. 66-72, 217, 233.) Apparently, the principal use in Mendocino County is in connection with reforestation.

### State Preemption

State regulation of pesticide marketing began in 1901 with additional regulations adopted in 1911 and 1933. Pesticide usage was not regulated by

---

[1]Appellant interveners are Proponents of the Initiative, Owners of Endangered Real Property, Sierra Club, Inc., New Growth, Northwest Forest Workers Association, Round Valley Woodwrights, Citizens Against Aerial Application of Phenoxy Herbicides, Dr. Burton D. Tepfer, Salmon Trollers Marketing Association and Edmeades Vineyards, Inc.

California Forest Protective Association is also an intervener supporting respondent.

the state but was regulated solely by the counties until after World War II. (Dunning, *Pests, Poisons and the Living Law: The Control of Pesticides in California's Imperial Valley* (1972) 2 Ecology L.Q. 633, 643-644, 668.) In 1949, the state imposed a permit system for application of some pesticides, licensed pesticide applicators, and made 2,4-D a restricted material. (Stats. 1949, ch. 1295, pp. 2277-2278; ch. 1294, pp. 2276-2277; ch. 1043, pp. 1938-1941.) In 1971, amendments were made to the pest applicator law, and the state licensed pest control advisors. (Stats. 1971, ch. 1276, pp. 2495-2504; ch. 1187, pp. 2259-2267.) Both the state permit and pest control licensing systems were largely copied from Imperial County laws. (Dunning, 2 Ecology L.Q., *supra,* at pp. 644, 653.)

After the Attorney General stated in an opinion (59 Ops. Cal. Atty. Gen. 300 (1976)) that the use of pesticides was subject to the requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.), the Legislature in 1978 exempted the pesticide regulatory program from the act (Stats. 1978, ch. 308, p. 643 et seq.), and directed the Department of Food and Agriculture to develop a regulatory program that would be the functional equivalent of the California Environmental Quality Act (*id.,* §§ 3, 4). In 1980, the regulatory program was certified by the Secretary of the Resources Agency as the functional equivalent.

The result of this gradual growth of regulation may be described as follows:

Division 6 of the Food and Agricultural Code[2] generally regulates those who are in the business of recommending, selling and applying pesticides and requires that they be licensed by the state. (See, e.g., §§ 11701-11711, 12001-12024, 12101-12112.)

Division 7 of the code regulates the use of agricultural chemicals. (§ 12501 et seq.) Among the stated purposes of the regulatory scheme are: the proper, safe and efficient use of pesticides essential for production of food and fiber, protection of the public health and safety, protection of the environment from harmful pesticides by prohibiting, regulating or controlling uses, assurance of safe working conditions for agricultural and pesticide control workers, permitting pest control by licensees under strict control of the director and county agricultural commissioners, and encouragement of pest management systems stressing application of biological and cultural control techniques with selective pesticides with the least possible harm to nontarget organisms and the environment. (§ 11501.)

---

[2]Unless otherwise specified, all statutory references hereafter are to the Food and Agricultural Code.

The Director of the Department of Food and Agriculture and the county agricultural commissioners under the director's supervision enforce the regulatory scheme. (§ 11501.5.) The director is authorized to adopt regulations governing the conduct of the pest control business, which may be of statewide applicability or tailored to local needs. (§§ 11502, 14006.) County commissioners are appointed by county boards of supervisors (§ 2121) and prior to 1971 could adopt regulations (former § 11503). In that year the Legislature provided that commissioner regulations must be approved by the director before becoming operative. (§ 11503.)

However, the commissioners retained broad powers. With certain exceptions not relevant here, no person is to use any pesticide for any agricultural use except under a written permit of a county commissioner. (§ 14006.5.) The commissioner may refuse a permit for use of a restricted material if the proposed use has demonstrated serious uncontrolled adverse effects, the use is "of less public value or greater detriment to the environment than the benefit received by its use," or "there is a reasonably effective and practicable alternate material or procedure which is demonstrably less destructive to the environment." (§§ 14006.5, 12825, subds. (a), (b), (c).)[3]

---

[3]Section 14006.5 provides: "Except as provided in Section 14006.6, no person shall use or possess any pesticide designated as a restricted material for any agricultural use except under a written permit of the commissioner. No permit shall be issued for any restricted material for use in any manner other than pursuant to its registration without the approval of the director. *In addition, no permit shall be granted if the commissioner determines that the provisions of subdivision (a), (b), or (c) of Section 12825 would be applicable to the proposed use.*

"Before issuing a permit for any pesticide the commissioner shall consider local conditions including, but not limited to, the following:

"(a) Use in vicinity of schools, dwellings, hospitals, recreational areas, and livestock enclosures.

"(b) Problems related to heterogeneous planting of crops.

"(c) Applications of materials known to create severe resurgence or secondary pest problems without compensating control of pest species.

"(d) Meteorological conditions for use.

"(e) Timing of applications in relation to bee activity.

"(f) Provisions for proper storage of pesticides and disposal of containers.

"Each permit issued for any pesticide shall include conditions for use in writing." (Italics added.)

Section 12825 provides: "Pursuant to Section 12824, the director may, after hearing, cancel the registration of, or refuse to register, any economic poison:

"(a) Which has demonstrated serious uncontrollable adverse effects either within or outside the agricultural environment.

"(b) The use of which is of less public value or greater detriment to the environment than the benefit received by its use.

"(c) For which there is a reasonably effective and practicable alternate material or procedure which is demonstrably less destructive to the environment.

"(d) Which, when properly used, is detrimental to vegetation, except weeds, to domestic animals, or to the public health and safety.

"(e) Which is of little or no value for the purpose for which it is intended.

These are among the grounds warranting refusal or cancellation of registration by the director. (*Id.*) In addition, the commissioner or the director may order any person to cease operation of any equipment or facility which he finds being operated in violation of pesticide statutes or regulations or in a manner or under conditions "which may cause injury, illness, or adverse effects to persons or animals." (§ 11737.)

The director is required to designate a list of "restricted materials" based upon danger to public health, or hazards to applicators, farmworkers, animals, crops and the environment. He is also required to adopt regulations governing the application of "restricted materials," and prescribing when, where and how a restricted material may be used in the various areas of the state. He may also prohibit its use in areas. (§§ 14004.5, 14005, 14006.) The director is specifically required to adopt regulations governing the use of 2,4-D. (§ 14033.)

Section 14007 provides: "Every permit which is issued under the regulations adopted pursuant to this chapter is conditioned upon compliance with the *law* and regulations and upon such other specified conditions as may be required to accomplish the purposes of this chapter."[4] (Italics added.)

Pursuant to the statutory authority, the director has adopted numerous and detailed regulations governing the use of pesticides. (Cal. Admin. Code, tit. 3, §§ 2330-2487, 3135-3145.) The director has designated a number of herbicides as restricted materials, including 2,4,5-T, Silvex and 2,4-D. (*Id.*, § 2450, subd. (m).) Permits are required for use in liquid form of amounts in excess of one pint or, if diluted, one gallon and in dry formulation for amounts in excess of one pound or fifty pounds if containing less than 10 percent of the herbicide. (*Id.*, § 2452, subd. (d)(6)(7).) The director has adopted detailed regulations of the aerial application of herbicides, specifying when and where herbicides may be applied, height of discharge, permissible wind velocity, nozzle specifications and safety equipment. (*Id.*, § 2458.)

A county may make and enforce within its limits "all local, police, sanitary, and other ordinances and regulations not in conflict with general

---

"(f) Concerning which any false or misleading statement is made or implied by the registrant or his agent, either verbally or in writing, or in the form of any advertising literature.

"In making any such determination, the director may require such practical demonstrations as are necessary to determine the facts."

[4]Permits issued under the law recite that they may be revoked for failure to follow manufacturer's labeling or violation of "applicable laws," regulations or the conditions of the permit.

laws." (Cal. Const., art. XI, § 7.) "The authority to enact police ordinances for sanitation or health on the part of counties as well as chartered cities is just as broad, sweeping and inclusive as the powers with relation thereto which are vested in the legislature itself, except that they must not conflict with the Constitution or with general laws, . . ." (*Stanislaus Co. etc. Assn.* v. *Stanislaus* (1937) 8 Cal.2d 378, 383-384 [65 P.2d 1305]; *Matula* v. *Superior Court* (1956) 146 Cal.App.2d 93, 98 [303 P.2d 871].) Traditionally, the cities and counties have adopted regulations for the protection and preservation of public health. (E.g., *Huron Cement Co.* v. *Detroit* (1960) 362 U.S. 440, 446 [4 L.Ed.2d 852, 857, 80 S.Ct. 813, 78 A.L.R.2d 1294]; *City of Glendale* v. *Trondsen* (1957) 48 Cal.2d 93, 101 [308 P.2d 1]; *Laurel Hill Cemetery* v. *City and County* (1907) 152 Cal. 464, 470 [93 P. 70]; *Ex Parte Lacey* (1895) 108 Cal. 326, 328-329 [41 P. 411]; *Matula* v. *Superior Court, supra,* 146 Cal.App.2d 93, 101.)

The Legislature has not only recognized the rights of counties to regulate to preserve and protect public health but has imposed a duty to regulate. Health and Safety Code section 450 provides: "The board of supervisors of each county shall take such measures as may be necessary to preserve and protect the public health . . . including, if indicated, the adoption of ordinances, regulations and orders not in conflict with general laws, . . ."

It is clear that the initiative is a proper local regulation for health purposes authorized by the Constitution unless it conflicts with general laws, and in view of the long tradition of local regulation and the legislatively imposed duty to preserve and protect the public health, preemption may not be lightly found.

■ "Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates (*Chavez* v. *Sargent* [(1959)] 52 Cal. 2d 162, 176 [339 P.2d 801]; *In re Portnoy* [(1942)] 21 Cal.2d 237, 240 [131 P.2d 1]; *Pipoly* v. *Benson* [(1942)] 20 Cal.2d 366, 370 [125 P.2d 482, 147 A.L.R. 515]), contradicts (*Ex parte Daniels* [(1920)] 183 Cal. 636, 642-645 [192 P. 442, 21 A.L.R. 1172]), or enters an area fully occupied by general law, either expressly or by legislative implication (*In re Lane* [(1962)] 58 Cal.2d 99, 102 [22 Cal.Rptr. 857, 372 P.2d 897]; *Abbott* v. *City of Los Angeles* [(1960)], 53 Cal.2d 674, 682-688 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R. 2d 385]; *Chavez* v. *Sargent, supra,* 52 Cal.2d 162, 176-178). If the subject matter or field of the legislation has been fully occupied by the state, there is no room for supplementary or complementary local legislation, even if the subject were otherwise one properly characterized as a 'municipal affair.' (*In re Hubbard* [(1964)] 62 Cal.2d 119, 125 [41 Cal.Rptr. 393, 396 P.2d 809]; *In re Zorn* [(1963)] 59 Cal.2d 650 [30 Cal.Rptr. 811, 381 P.2d

635]; *In re Lane, supra,* 58 Cal.2d 99; *Abbott* v. *City of Los Angeles, supra,* 53 Cal.2d 674.)" (*Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 806-808 [100 Cal.Rptr. 609, 494 P.2d 681].)

■ The Legislature has not expressly prohibited local regulation of the aerial application of phenoxy herbicides, and the initiative ordinance neither duplicates nor contradicts any statute. Pointing out that the Legislature has recognized that the activity is both hazardous and socially useful, the Attorney General urges that there is a contradiction, claiming that the effect of the statutory scheme is to authorize activities not prohibited by the statutes and regulations. Reliance is placed on cases where it has been held that where a licensing scheme authorizes a person to practice a trade or profession, a local law imposing additional qualification is in conflict with the state scheme. (E.g., *Agnew* v. *City of Culver City* (1956) 147 Cal.App.2d 144, 150 [304 P.2d 788]; *Horwith* v. *City of Fresno* (1946) 74 Cal.App.2d 443, 448-449 [168 Cal.Rptr. 767].) The licensing cases are distinguishable. ■ Licensing regulates activity based on a determination of the qualifications of the licensee. (*Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 856 [76 Cal.Rptr. 642, 452 P.2d 930].) The Legislature has not directed that licensed persons must be permitted to use specific chemicals or otherwise provided that specified chemicals may be used. It has provided that a permit is necessary before use of chemicals.

The test for determining whether the area is fully occupied on the basis of legislative implication was established in *In re Hubbard, supra,* 62 Cal.2d 119, 128. ■ In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality." (*Id.*; *Galvan* v. *Superior Court, supra,* 70 Cal.2d 851, 859-860; *Bell* v. *City of Mountain View* (1977) 66 Cal.App.3d 332, 338 [136 Cal.Rptr. 8].)

■ Preemption by implication of legislative intent may not be found when the Legislature has expressed its intent to permit local regulations. Similarly, it should not be found when the statutory scheme recognizes local regulations.

Section 14007 provides that every permit to use agricultural pesticides is conditioned upon compliance with the "law" and regulations. An ordinance "is deemed to be 'a law' in this state." (*In re Johnson* (1920) 47 Cal.App. 465, 467 [190 P. 852]; 36 Ops. Cal. Atty. Gen. 256, 257 (1960); 4 Ops. Cal. Atty. Gen. 232, 233 (1944).) The absence of any express exclusion of county regulation, when viewed in the light of the historic role of county regulation, the duty imposed on counties to adopt ordinances to preserve and protect public health (Health & Saf. Code, § 450), and the enforcement role assigned to the county commissioners, requires that the word "law" as used in section 14007 be given its traditional meaning as including ordinances.

Further support for attributing to the word "law" its traditional meaning is shown by the fact that the Legislature has manifested its intent that local concerns and conditions must be given paramount importance. Although section 11503 provides that regulations adopted by county commissioners are not operative until approved by the director, the Legislature has provided that the director's regulations of use of restricted pesticides may be limited in "certain areas" (§ 14006, subd. (a)), and has provided that the county commissioners in determining whether to grant a permit shall not only address the same environmental concerns as those considered by the director in registering pesticides but must also consider local conditions such as the location of schools, dwellings, hospitals, and recreational areas (§§ 14006.5, 12825). In sum, rather than a uniform system of regulation throughout the state, the Legislature has chosen a flexible system, addressing local needs and environmental concerns and placing wide discretion in the county commissioners. Because local matters are given such emphasis, there is no reason to reject the ordinary meaning of the word "law" as including ordinances or to find an intent of the Legislature to preclude local regulations.

Moreover, the use of the word "law" shows that the Legislature intended to require compliance with other state statutes, including those found in other codes, and other statutes permit local regulation of air pollution and water quality, the purposes of the initiative ordinance. Local and regional authorities have the primary responsibility for the control of air pollution from all sources other than emissions from motor vehicles. (Health & Saf. Code, §§ 39002, 40000.) Any local or regional authority is authorized to establish additional, stricter standards than those set forth by state law. (*Id.,* 39002, 41508, 41509.) Similarly, in Division 7 of the Water Code which regulates water pollution, the Legislature has provided that no provision of the division or ruling of the state and regional water boards is a limitation on the power of a county to adopt and enforce additional regulations im-

posing further limitations on the disposal of water or any activity which might degrade the quality of the waters of the state. (Wat. Code, § 13002.) Because section 14007 requires compliance with the "law," it requires compliance with the air and water pollution statutes, and since they permit county regulation with local ordinances imposing stricter air and water pollution standards, they authorize the initiative ordinance.

Had the Legislature intended to require compliance only with provisions of the Food and Agricultural Code or its pesticide provisions, it could easily have substituted other provisions. Its failure to do so can only be read as meaning that the term "law" included other statutes and ordinances.

Because of section 14007, the pesticide regulations do not meet the first two tests established in *Hubbard* for implied preemption. The use of the term "law," coupled with air and water pollution statutes permitting local regulation, preclude a conclusion of clear indication that use of agricultural chemicals is a matter of exclusive state concern or that a paramount state concern will not tolerate local regulation. The third test established by *Hubbard* cannot be met because the initiative ordinance has little effect on transient citizens, and it cannot be concluded that the effect on them outweighs the possible benefit to the municipality.

The Attorney General argues that the reference to the "law" in section 14007 is limited to valid laws and that a local ordinance regulating pesticides is not valid because the area is preempted by state regulation. It is no doubt true that only valid laws are intended to come within the term. However, the reasoning is circular. As pointed out above, in determining whether there is implied preemption we must look at the entire statutory scheme, and in the instant case section 14007 is part of that scheme. Thus, the determination whether the Legislature has intended to occupy the field must include consideration of the provisions of section 14007, and when we do so, we find that local ordinances are permitted. It cannot properly be concluded that local ordinances are invalid on grounds of implied preemption before it has been determined that the state has occupied the field.

The Attorney General also urges that while the air and water pollution statutes reserve local power to adopt additional regulations, those statutes must be harmonized with the Food and Agricultural Code sections which specifically regulate the use of pesticides and that the Food and Agricultural Code provisions take precedence over the local powers recognized in the air and water pollution statutes.[5] ██ Although ordinarily specific provi-

[5] The Attorney General argues that local pesticide regulation is preempted but that state agencies like the Air Resources Board may regulate the use of pesticides.

sions relating to a particular subject will govern with respect to that subject as against general provisions (*Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 976-977, fn. 8 [140 Cal.Rptr. 669, 568 P.2d 394]; *Rose* v. *State of California* (1942) 19 Cal.2d 713, 723-724 [123 P.2d 505]; *Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 965 [131 Cal.Rptr. 172]), this principle of statutory construction is entitled to little weight when the specific statute expressly requires compliance with other laws and when there is no direct conflict between the various laws. Rather the statutes and codes should be harmonized to effectuate all insofar as possible. (*Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp., supra,* 59 Cal.App.3d 959, 965.) ■ Where, as here, there is no direct conflict between the statutes and the specific statutes require compliance with the law, that harmonization is accomplished by permitting regulations to preserve and protect public health under either the Food and Agricultural Code or under the air and water pollution statutes.

We conclude that the Legislature has not preempted local regulation of pesticide use.[6]

### Federal Preemption

■ Intervener, California Forest Protective Association (Association), urges that the initiative ordinance is in conflict with federal law and therefor invalid. It does not claim that Congress intended to preclude state regulation, rather it urges on the basis of statutory history that Congress intended to permit state regulation but prohibit local regulation. Appellants argue that Congress has not expressly stated its intention to preempt local regulation, that the statutory history does not reflect the requisite clear showing of intent to preempt local ordinances and that in any event Congress could not, consistent with the Tenth Amendment to the United States Constitution, interfere with the states' powers to distribute integral governmental functions among its agencies and permit state regulation while prohibiting local.

The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) (7 U.S.C. § 136 et seq.) includes an extensive system of regulation of pesti-

---

[6]In view of the above conclusion, it is unnecessary to reach defendants' argument that, while county ordinances adopted by the board of supervisors may be preempted by state law, initiative ordinances may not. We recently recognized that election officials have been ordered not to place initiative and referendum proposals on the state ballot on the ground that the electorate did not have the power to enact them since the subject matter was not a municipal affair. (*Legislature of the State of California* v. *Deukmejian* (1983) 34 Cal.3d 658, 666-667 [194 Cal.Rptr. 781, 669 P.2d 17].) We pointed out that the initiative power has been considered to be no greater with respect to the nature and attributes of the statutes that may be enacted than that of the Legislature. (*Id.,* at pp. 673-674.) The same relationship may prevail as to county boards of supervisors and county initiatives.

cides. As amended by the Federal Environmental Pesticide Control Act of 1972 (FEPCA) (Pub. L. 92-516), it was extended to the sale and use of any registered pesticide. (See e.g., 7 U.S.C. § 136j (a)(1)(E)(F).)

Section 136v added by the 1972 act provides: "(a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter."[7]

When Congress amended FIFRA in 1972, it also added a definition of the term "State." "The term 'State' means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa" (7 U.S.C. § 136 (aa)).

There is no provision in FIFRA *expressly* prohibiting local governmental agencies from regulating the use of pesticides, *expressly* providing that the term "State" excludes such agencies, or providing that the state may not act through its local agencies.

As originally reported to the House by the Committee on Agriculture,[8] the bill which was to become FEPCA (H.R. No. 10729, 92d Cong., 1st Sess. (1971)) contained a provision permitting state regulation to the extent that it did not permit any sale or use prohibited by the act "or restrict by license or permit the use of a pesticide registered for general use." (117 Cong. Rec. 40027 (1971).) After substantial debate pointing out that some states had adopted restrictions on pesticides which went beyond federal restrictions, the bill was amended to in effect delete the quoted clause. Although one congressman thereafter spoke against the bill, stating it failed to recognize that needs created by local conditions are best handled by state and local agencies, no amendment to add local agencies to the bill was proposed, and the bill was approved shortly thereafter by the full House. (117 Cong. Rec. 40066-40068 (1971).)

The Senate Committee on Agriculture and Forestry reported H.R. No. 10729 out of committee with a recommendation of "do pass." Its report

---

[7]The section was amended to its present form in 1978, but the amendment merely added the words "federally registered." (Cf. Pub. L. 92-516, § 22 with Pub. L. 95-396, § 22.)

[8]In its initial report on the bill, the House Committee on Agriculture stated that it rejected a proposal that would have permitted political subdivisions of the states to further regulate pesticides. It, however, did not go as far as the Senate Agriculture and Forestry Committee and state that the bill's provisions should be understood as depriving political subdivisions from regulating pesticides. (H.R. Rep. No. 92-511, 1st Sess., p. 16 (1971).)

stated in part: "4. The Senate Committee considered the decision of the House Committee to deprive political subdivisions of States and other local authorities of any authority or jurisdiction over pesticides and concurs with the decision of the House of Representatives. Clearly, the fifty States and the Federal Government provide sufficient jurisdictions to properly regulate pesticides. Moreover, few, if any, local authorities whether towns, counties, villages, or municipalities have the financial wherewithal to provide necessary expert regulation comparable with that provided by the State and Federal Governments. On this basis and on the basis that permitting such regulation would be an extreme burden on interstate commerce, it is the intent that section 24, by not providing any authority to political subdivisions and other local authorities of or in the States, should be understood as depriving such local authorities and political subdivisions of any and all jurisdiction and authority over pesticides and the regulation of pesticides." (Sen. Rep. No. 92-838, 2d Sess. (1972) reprinted in 1972 U.S. Code Cong. & Admin. News, No. 3, at p. 4008.)

The bill was then reported to the Committee on Commerce, and it made a number of amendments, including one assigning to local as well as state governments "the authority to regulate the sale or use of a pesticide or device, so long as such regulation does not permit sale or use prohibited under the Act." (Sen. Rep. 92-970, 2d Sess. (1972) reprinted in 1972 U.S. Code Cong. & Admin. News, No. 3, at p. 4128.)

After reviewing the Commerce Committee action, the Agriculture and Forestry Committee filed a supplemental report (pt. II, Sen. Rep. No. 92-838, 2d Sess. (1972) reprinted in 1972 U.S. Code Cong. & Admin. News, No. 3 beginning at p. 4023) setting out its reasons for its opposition to the Commerce Committee amendments. The Agriculture and Forestry Committee reiterated its opposition to the regulation of pesticide sale and use by local governments. It stated that regulation by the federal government and the 50 states should be sufficient and preempt the field, and it again set forth the material quoted above from its original report.

Thereafter, a compromise substitute to the Committee on Commerce amendments was offered supported by all members of the Committee on Agriculture and Forestry and a majority of the Committee on Commerce. The compromise bill deleted the provision for local government regulation. The "Explanation of Compromise Substitute for the Text of H.R. 10729" expressly pointed out that the Committee on Commerce amendment giving local governments authority to regulate use of pesticides was not included in the substitute. (118 Cong. Rec. 32257-32258 (1972).) Shortly, thereafter

the Senate passed H.R. No. 10729 without a dissenting vote. (*Id.* at p. 32262 (1972).)

There was no difference in the House and Senate passed versions of the provision governing state regulation, and it apparently was not addressed in the Conference Report or other materials. The Conference Report was passed by both Houses. (*Id.*, at pp. 33924, 35546.)

██ Within constitutional limits Congress may preempt state authority by so stating in express terms or, absent explicit preemptive language, Congress' intent to supersede state law altogether may be found from a scheme of federal regulation so pervasive as to warrant the inference that Congress left no room to supplement it. (*Pacific Gas & Electric Company* v. *State Energy Resources Conservation & Development Commission* (1983) 461 U.S. 190, 203-204 [75 L.Ed.2d 752, 765, 103 S.Ct. 1713]; *Exxon Corp.* v. *Eagerton* (1983) 462 U.S. 176, 180-182 [76 L.Ed.2d 497, 504-505, 103 S.Ct. 2996].) ██ In the instant case, we cannot infer that Congress concluded that its scheme of regulation was so pervasive that it should not be supplemented. Rather Congress has made clear that further restrictive regulation is permissible. It has provided that a "State" may adopt more restrictive regulation.[9] (7 U.S.C. § 136v.)

The question before us is whether Congress by providing for further "State" regulation, has prohibited in express terms a state from authorizing its local governmental entities to participate in its regulatory program. There is nothing in 7 United States Code section 136v expressly prohibiting states from delegating part of their authority to their agencies, and as we have seen, California has authorized local authorities to regulate pesticides.

The Association relies upon the maxim *expressio unius est exclusio alterius* (see *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537]), claiming that the reference to "State" should be read as excluding local governmental regulation. Because local governmental agencies are political subdivisions of the state, the maxim may not be applied. The maxim may be applied to comparable or perhaps similar nouns, but there is no reason to apply it to exclude agents of the enumerated party. Moreover, even if the maxim were applicable, it would only warrant the conclusion that the statute did not authorize regulation; it would not establish that local regulation was prohibited.

The Association also claims that the legislative history establishes that Congress intended that "State," as used in 7 United States Code section

---

[9]For this reason, it is unnecessary to set forth in detail the scheme of federal regulation.

136v, refer to the state government alone to the exclusion of local governmental entities. The United States Supreme Court has resorted to legislative history in considering claims of federal preemption. (*Philko Aviation, Inc.* v. *Shacket* (1983) 462 U.S. 406, 410-411 [76 L.Ed.2d 678, 683 103 S.Ct. 2476]; *Pacific Gas & Electric Company* v. *State Energy Resources Conservation and Development Commission, supra,* 461 U.S. 190, 209 [75 L.Ed.2d 752, 768].)

■ However, in the absence of a clear manifestation of intention to preclude state regulation in an area traditionally regulated by the exercise of state or local police powers, it will not be presumed that a federal statute was intended to supersede such powers. (*Jones* v. *Rath Packing Co.* (1977) 430 U.S. 519, 525-526 [51 L.Ed.2d 604, 613-614, 97 S.Ct. 1305]; *De Canas* v. *Bica* (1976) 424 U.S. 351, 356 [47 L.Ed.2d 43, 49, 96 S.Ct. 933]; *New York State Dept. of Social Services* v. *Dublino* (1973) 413 U.S. 405, 413 [37 L.Ed.2d 688, 694, 93 S.Ct. 2507].)

■ The legislative history does not demonstrate a clear congressional intention to preempt traditional local police powers to regulate the use of pesticides or to preempt state power to distribute its regulatory authority between itself and its political subdivisions. 7 United States Code section 136v is phrased to authorize states to adopt more stringent regulations.

The report of the House Committee on Agriculture did not state that political subdivisions should be prohibited from regulating but only that they should not be authorized to regulate. This is consistent with the ordinary view that states are free to distribute regulatory power between themselves and their political subdivisions. Acceptance of the rejected proposal to authorize political subdivisions to regulate would have deprived the states of their traditional power to refuse to permit local regulation. The report of the House Committee on Agriculture is thus consistent with the usual view that local regulation is neither authorized nor prohibited and that it is for the states to determine whether the powers reserved to them by the Constitution and statutes shall be exercised directly by the states, by political subdivisions or both.

The record of House proceedings fails to reflect any understanding that local regulation was prohibited. On the floor of the House, the preemption provision was diluted by eliminating the provision prohibiting states from restricting by license or permit the use of a registered pesticide. The isolated comment of one congressman who opposed the bill that it failed to recognize that particular needs created by local conditions are best handled by state and local agencies does not establish that local regulation is prohibited. In

the context of a bill authorizing states to adopt more restrictive regulation, the comment appears, by coupling both state and local agencies, to be an attack on the provision prohibiting states on the basis of local needs from authorizing uses prohibited by federal regulation. The Conference Committee Report did not comment on the language giving states power to regulate, and there is no reason to conclude that the subsequent House approval of the Conference Committee Report reflected an understanding that the provision giving the states power to adopt more restrictive regulation impinged upon the states' authority to delegate powers to local agencies.

Properly analyzed, the history of the Senate proceedings is also consistent with the usual view that it is for the states to determine whether their reserved powers shall be exercised directly, by political subdivisions, or by both. Although the Senate Committee on Agriculture and Forestry clearly sought to prohibit regulation by political subdivisions, the Committee on Commerce sought to authorize regulation by political subdivisions, and then there was a compromise. The explanation of the compromise stated that the Committee on Commerce amendment giving local governments authority to regulate was deleted but it did not state that the views of the Committee on Agriculture and Forestry were adopted in their entirety on this issue or that the compromise adopted or rejected the middle ground which would leave the states to determine how to allocate their regulatory resources.[10] The history of the Senate proceedings establishes only that there was a compromise and that under that compromise the Committee on Commerce's intention to authorize local government regulation was rejected. The act provides a "state" may regulate, which would ordinarily be interpreted as permitting the states to delegate their power, and nothing in the compromise explanation precludes such delegation.

The legislative history does not manifest a clear congressional intent to preclude states from authorizing local governmental entities to adopt restrictive regulations of pesticides.[11]

The judgment is reversed.

Bird, C. J., Mosk, J., and Reynoso, J., concurred.

---

[10]The Association also relies on statements in the United States Senate that the bill is designed to "guarantee" the right to properly use pesticides, but the statement must be viewed in the light of 7 United States Code section 136v permitting restrictive regulation by the state.

[11]This conclusion makes it unnecessary to determine whether Congress could validly limit the power of the state to distribute internally its traditional powers of regulation. (See *National League of Cities* v. *Usery* (1976) 426 U.S. 833 [49 L.Ed.2d 245, 96 S.Ct. 2465].)

KAY, J.*—I respectfully dissent. While I concur entirely with the majority's analysis of the inapplicability of federal preemption, I cannot accept its analysis regarding state preemption. Curiously, the majority seems impressed that discretion is delegated to local commissioners to place conditions upon or to deny permits on a case by case basis, even though, as Justice Kaus points out, each individual ruling is subject to review by the State Director of Food and Agriculture. With all due respect, any reliance upon such limited powers is misplaced, for no such local authority exists where a *regulation* is concerned. The majority refers to section 11503 of the California Food and Agriculture Code, but is not persuaded by the unambiguous language that where regulations are concerned the actions of local commissioners are expressly subordinate to the state. Section 11503 states that each local regulation of a commissioner is subject to the approval of the State Director of Food and Agriculture "before it may become operative." Although the ordinance in question in this case was adopted by local initiative and not promulgated by a commissioner, the majority refers to the ordinance as a "local regulation," and no meaningful distinction can be made between a commissioner's local regulation and this local regulation insofar as state interest is concerned. Section 11503 is a clear expression of state supremacy.[1]

The director's disapproval of the local action, voiced before this court by the Attorney General, was unheeded by the majority. One would be hard pressed to draft stronger language than that contained in section 11503 to indicate the intention of the Legislature regarding the resolution of conflicts such as the one presented in this case.

For the moment, a praiseworthy result may have been reached, for the aerial spraying of agent orange has been effectively banned in one county. However, the majority decision creates direct authority for the piecemeal adoption of local ordinances prohibiting aerial spraying of pesticides which, however reluctantly used, have been and will probably continue to be necessary as last resorts in protecting agriculture on a statewide basis. Henceforth the final battlefields involving the question of the survival of the state's vast agricultural industry will include town halls, city halls and supervisors'

---

*Assigned by the Chairperson of the Judicial Council.

[1]The cornerstone of the majority decision is the principle that this local ordinance is special because it is for the purpose of protecting public health. This approach overlooks the fact that the Legislature has already placed this very problem in the hands of the State Director of Food and Agriculture.

"If, in the opinion of the commissioner, the public health, welfare or safety requires that any regulation take effect immediately he shall designate it as an emergency regulation and specify in writing the facts which constitute the necessity. An emergency regulation shall become effective on the date it is approved by the director." (Food & Agr. Code, § 11511.)

chambers of communities which may not share a statewide concern for the outcome of this war.

**KAUS, J.**—I respectfully dissent.

I

Like Judge Kay, I cannot agree with the majority that the county ordinance at issue here—banning all aerial spraying of designated herbicides throughout the county—can coexist with the state statutory scheme.

As the majority recounts, over the past three and a half decades the Legislature has adopted a series of enactments which provide for the comprehensive regulation of the use of pesticides and herbicides in California by the state Department of Food and Agriculture (hereafter department). As section 11501 of the Food and Agricultural Code makes clear, the purpose of this legislation is not only to protect the health and safety of the public and the environment from the dangers of pesticides, but also "[t]o provide for the proper, safe, and efficient use of pesticides essential for production of food and fiber" and "[t]o permit agricultural pest control by competent and responsible licensees and permittees under strict control of the director and commissioners."[1] Thus, the department's mission requires it to consider both the potential hazards and benefits of pesticides and herbicides in regulating their use for agricultural purposes throughout the state.

Pursuant to its statutory authorization, the department has promulgated detailed license and permit regulations pertaining to the aerial spraying of the herbicides at issue, specifying not only who may do the spraying, but also when and where such herbicides may be used, the permissible height at which the herbicides may be discharged, and the maximum wind velocity when discharge is permissible. (See, e.g., Cal. Admin. Code, tit. 3, §§ 2450, 2452, 2458.) Although county commissioners, who administer the state permit procedure, have discretion to impose additional requirements in light of local needs and problems (§§ 11503, 14006.5), as Judge Kay

---

[1]In 1978, in enacting legislation which led to the department's current regulations relating to the consideration of the environmental impact of pesticides in granting or withholding permits, the Legislature made the following findings, among others: "(a) Agriculture is a major and essential component of California's economy. [¶] (b) The proper, safe, and efficient use of pesticides is essential for the protection and production of agricultural commodities and for health protection. [¶] (c) Timeliness in the application of pesticides is paramount in good pest management and is essential in the prevention of economic waste. [¶] (d) Reasonable environmental review of such pesticide use is prudent and appropriate." (Stats. 1978, ch. 308, § 1, subds. (a)-(d), p. 643.)

Unless otherwise indicated, all statutory references are to the Food and Agricultural Code.

notes, even a local commissioner's authority in this regard is expressly subject to the state director's approval. (§§ 11503; 14009.) Given this legislative scheme, I see no room for recognizing a broad legislative power in the county to prohibit all aerial spraying of a pesticide that is specifically authorized by a state-granted permit.

In upholding the ordinance, the majority relies heavily on section 14007 which provides that "[e]very permit . . . issued [pursuant to the department's regulations] . . . is conditioned upon compliance with the *law* and regulations and upon such other specified conditions as may be required to accomplish the purposes of this chapter." (*Ante,* at p. 483 [maj.'s italics].) Since a county ordinance is a "law," the majority reasons that section 14007 recognizes a county's power to impose any additional restrictions on the use of pesticides it desires, including by necessary implication an entire ban on the use of a pesticide that has been specifically approved by the department.

In my view, this reading of the statute strains credulity. While section 14007 recognizes a permit-holder's obligation to comply with generally applicable county ordinances that do not unreasonably impinge on the activities specifically authorized by the state-authorized permit, the section cannot properly be read to afford a county the authority effectively to revoke the state-granted permit by proscribing the state-authorized activity. If the Legislature had intended to give counties a veto power over the use of a particular pesticide or the granting of a permit, it certainly would have expressed that thought in language clearer than section 14007.

The majority's additional reliance on the air and water pollution statutes is similarly unavailing. While those enactments do provide that local entities may adopt stricter air or water pollution standards than those imposed by the relevant state or regional air and water pollution agencies, nothing in those statutes relates to the specific subject of pesticides or gives any indication that the Legislature intended to affect the Department of Food and Agriculture's authority in this area. Indeed, legislation enacted in 1978— after the air and water pollution provisions cited by the majority—makes it quite clear that the Legislature has determined that the department is the appropriate agency to consider the environmental impact of pesticide use in this state. (Stats. 1978, ch. 308, §§ 1-9, pp. 643-648. See Comment, *The Regulation of Pesticide Use in California* (1978) 11 U.C.Davis L.Rev. 273, 295-297.) A more recent statute—enacted in 1983—reconfirms the legislative intent in this regard. (Stats. 1983, ch. 1047, § 2, pp. ——, adding §§ 14021-14026.)

As noted above, the state pesticide legislation requires the department to consider both the dangers and benefits of pesticides in its regulatory measures. If an individual county, for its own reasons, could totally bar the use of a pesticide which the department has found essential to the state's agricultural interests as a whole, one important purpose of the pesticide legislation would be defeated. Accordingly, I conclude that the ordinance is preempted by state law.

II

Although, in light of the above conclusion, I need not reach the federal preemption issue, I disagree with the majority's resolution of that issue as well. Granted that, under normal circumstances, a federal statute which expressly authorizes "a State" to impose more restrictive regulations than are provided by federal law can reasonably be interpreted to permit political subdivisions of a state to exercise a like power, the legislative history of the Federal Environmental Pesticide Control Act of 1972 strongly demonstrates a contrary congressional intent in this instance.

As the majority acknowledges, the report of the Senate Agriculture and Forestry Committee on the 1972 act expressly stated: *"The Senate Committee considered the decision of the House Committee to deprive political subdivisions of States and other local authorities of any authority or jurisdiction over pesticides and concurs with the decision of the House of Representatives.* Clearly, the fifty States and the Federal Government provide sufficient jurisdictions to properly regulate pesticides. Moreover, few, if any, local authorities whether towns, counties, villages, or municipalities have the financial wherewithal to provide necessary expert regulation comparable with that provided by the State and Federal Governments. On this basis and on the basis that permitting such regulation would be an extreme burden on interstate commerce, *it is the intent that Section 24, by not providing any authority to political subdivisions and other local authorities of or in the States, should be understood as depriving such local authorities and political subdivisions of any and all jurisdiction and authority over pesticides and the regulation of pesticides."* (Italics added.) (Sen. Rep. No. 92-838, 2d Sess. (1972) reprinted in 1972 U.S. Code Cong. & Admin. News, No. 3, at p. 4008.)

The majority seeks to dismiss this language by suggesting (1) that the relevant House committee had a different view of the permissibility of local regulation under the proposed federal act and (2) that the quoted report of the Senate Agriculture and Forestry Committee was superseded by a subsequent compromise with the Senate Commerce Committee. (*Ante,* pp. 492-

493.) Both suggestions are based on an untenable reading of the legislative record.

In its initial report on the bill in question, the House Committee on Agriculture stated that while the relevant provision of the legislation would permit "[t]he States . . . completely [to] prohibit the use of these 'restricted use' pesticides within their jurisdictions," "*the Committee rejected a proposal which would have permitted political subdivisions to further regulate pesticides* on the grounds that the 50 States and the Federal Government should provide an adequate number of regulatory jurisdictions." (Italics added.) (H.R.Rep.No. 92-511, 1st Sess. p. 16 (1971).) This is a plain statement that the House committee did not intend to permit supplementary regulation by local political subdivisions. Although the majority suggests that this language should be interpreted to mean that the house committee simply intended to refrain from affirmatively authorizing local regulation as a matter of federal law but did not intend to prohibit states from delegating such authority to political subdivisions, that reading manifestly does not square with the committee's conclusion that "the 50 States and the Federal Government should provide an adequate number of regulatory jurisdictions."

The majority's treatment of the Senate proceedings is similarly flawed. As the majority points out, after the Senate Agriculture and Forestry Committee issued its report clearly stating that local regulation was to be prohibited, the Senate Commerce Committee proposed an amendment to the bill which, along with many other substantial changes, would have expressly permitted such local regulation. (Sen.Rep.No. 92-970, 2d Sess. (1972) reprinted in 1972 U.S. Code Cong. & Admin. News, No. 3, pp. 4111-4112, 4128.) Thereafter, the two Senate Committees met and worked out a compromise which settled the numerous differences in the bills that had emerged from the two committees. (See Explanation of Compromise Amendment in the Nature of a Substitute, reprinted in 1972 U.S. Code Cong. & Admin. News, No. 3, pp. 4088-4092.) With respect to the provision involved in this case, the text proposed by the Agriculture and Forestry Committee was adopted; the Commerce Committee's amendment was dropped. (*Id.*, at p. 4091.)

This history again plainly shows an intent to prohibit local regulation. In refusing to draw this conclusion, the majority states: "The explanation of the compromise stated that the Committee on Commerce amendment giving local governments authority to regulate was deleted but it did not state that the views of the Committee on Agriculture and Forestry were adopted in their entirety on this issue or that the compromise adopted or rejected the middle ground which would leave the states to determine how to allocate

their regulatory resources. The history of the Senate proceedings establishes only that there was a compromise and that under that compromise the Committee on Commerce's intention to authorize local government regulation was rejected." (*Ante,* p. 493.)

With all respect, I find this reasoning specious. Since the compromise bill adopted the Agriculture and Forestry Committee's version without change, ordinary principles of statutory construction suggest that the provisions should be interpreted in light of the intent expressed in that committee's report. If there had been any intent to modify the effect of the provision as expressed in that report, it would surely have been noted in the explanation of the compromise. Absent any such indication, the conclusion the majority draws from the Senate proceedings is unsupportable.

Thus, the legislative history from both houses of Congress indicates that the drafters of the legislation did not intend to permit supplementary regulation by local political subdivisions.

Accordingly, even if the ordinance in question were compatible with state law, it does not withstand a federal preemption challenge. (See *L.I. Pest Control Ass'n, Inc.* v. *Town of Huntington* (1973) 72 Misc.2d 1031 [341 N.Y.S.2d 93, 96], affd. 43 App.Div.2d 1020 [351 N.Y.S.2d 945].)

I would affirm the trial court judgment granting summary judgment for the state.

Grodin, J.—Concurred in Part II.