[No. A053695. First Dist., Div. Two. Nov. 25, 1992.]

CHANNING PROPERTIES, Plaintiff and Appellant, v.
CITY OF BERKELEY et al., Defendants and Respondents.

90

COUNSEL

David A. Self and Stuart A. McIntosh for Plaintiff and Appellant.

Manuela Albuqerque, City Attorney, and Thomas B. Brown, Deputy City Attorney, for Defendants and Respondents.

OPINION

KLINE, P. J.—Channing Properties appeals from a judgment on the pleadings in favor of the City of Berkeley and City of Berkeley Rent Stabilization Board in an action regarding the city's laws regulating the removal of housing from the residential rental market. It claims the judgment must be reversed because state law preempts the local laws in question.

## STATEMENT OF THE CASE AND FACTS

Appellant Channing Properties is the owner of rental property in the City of Berkeley (the City) consisting of 33 residential units. On June 29, 1989, appellant filed a complaint for declaratory relief as to the validity of the City's laws restricting removal of housing from the rental market. Appellant challenged certain provisions of the Berkeley Municipal Code (B.M.C.) as imposing more stringent requirements on landlords wishing to remove residential property from the rental market than allowed under the Ellis Act (Gov. Code, § 7060 et seq.; hereinafter Act),[1] including requirements that such landlords provide tenants six months' notice before removing the property from the rental housing market and pay $4,500 per unit for relocation expenses. On November 16, the complaint was amended to add "2601 Channing Way Tenant's Union" as real party in interest. On April 9, 1990, 2601 Channing Way Tenant's Union filed a cross-complaint for injunctive relief against appellant and its general partner.

On March 7, 1991, the City moved for judgment on the pleadings on the grounds that the challenged laws were not preempted by the Act. This motion was granted by order filed April 17 and a judgment of dismissal was entered on April 18. A timely notice of appeal was filed on May 14, 1991.

## DISCUSSION

In 1984, the California Supreme Court ruled that a city could restrict the circumstances in which owners of residential rental properties could evict their tenants in order to remove the properties from the rental market. (*Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97 [207 Cal.Rptr. 285, 688 P.2d 894].) In response, the Legislature enacted the Act for the express purpose of overruling *Nash* "to the extent that the holding, or portion of the holding, conflicts with this chapter, so as to permit landlords to go out of business." (§ 7060.7.) Section 7060, subdivision (a), provides: "No public entity, as defined in Section 811.2, shall, by statute, ordinance, or regulation, or by administrative action implementing any statute, ordinance or regulation, compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease."

B.M.C. chapter 13.77 contains local requirements for withdrawal of residential rental accommodations from the market, adopted with the express intent "to accord tenants the maximum protections which are available pursuant to Government Code Section 7060 and to provide certain additional

---

[1]All further statutory references will be to the Government Code unless otherwise specified.

rights and protections necessary to deal with the housing shortage in the city of Berkeley." (B.M.C., § 13.77.020.A.) Among other things, the City requires owners who intend to withdraw their units from the rental market to provide written notice of that intention to each tenant no less than six months prior to the date upon which the accommodation is to be withdrawn, along with notices of termination of tenancy having effective dates "no earlier than one hundred eighty days after the date of service . . . ." (B.M.C., § 13.77.050.A.1.) Within five days of service on the tenants of the notice of intent to withdraw the accommodation from rent or lease, owners must deposit into escrow in trust for the tenants a relocation payment of $4,500 per unit, to be divided equally among all tenants occupying the unit at the time of service of the notice of intention. (B.M.C., §§ 13.77.055.A., 13.77.055.B.) Tenants are entitled to an advance of $2,000 at anytime thereafter, and to the balance of $2,500 upon surrender of possession or stipulation for judgment for possession. (B.M.C., § 13.77.055.C.) Additionally, owners must notify the city of their intention to withdraw rental property no less than 60 days prior to the date of withdrawal (B.M.C., § 13.77.050.A.2) and at the same time record with the county recorder a memorandum summarizing the provisions of that notice (B.M.C., § 13.77.050.A.3), file and record a certificate that actions have been initiated as required by chapter 13 and other applicable law to terminate any existing tenancies (B.M.C., § 13.77.050.A.3), and notify any tenant to be displaced that the city has been notified. (B.M.C., § 13.77.050.A.4.)

Appellant claims the City's ordinances are preempted because the Act fully occupies the field of substantive eviction controls over landlords wishing to remove rental properties from the market, the City's notice requirements conflict with notice provisions of the Act, and the City's relocation payment requirement exceeds the scope of such assistance authorized by the Act.

## I.

■ "Under the police power granted by the Constitution, counties and cities have plenary authority to govern, subject only to the limitation that they exercise this power within their territorial limits and subordinate to state law. (Cal. Const., art. XI, § 7.)" (*Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885 [218 Cal.Rptr. 303, 705 P.2d 876].) "If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void. [Citations.] A conflict exists if the local legislation ' "duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." ' " (*Ibid.; People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 484 [204

Cal.Rptr. 897, 683 P.2d 1150].) " 'If the subject matter or field of the legislation has been fully occupied by the state, there is no room for supplementary or complementary local legislation, even if the subject were otherwise one properly characterized as a "municipal affair." [Citations omitted.]' " (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d at p. 484.)

■ Where local legislation does not expressly contradict or duplicate state law, it must be determined whether the local legislation has been preempted by implication. "In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of statewide concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' " (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d at p. 485, quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809].) "Preemption by implication of legislative intent may not be found when the Legislature has expressed its intent to permit local regulations. Similarly, it should not be found when the statutory scheme recognizes local regulations." (*Ibid.*)

Appellant's initial argument that the Act fully occupies the area of substantive eviction controls over landlords who wish to remove residential rental properties from the housing market is based on *City of Santa Monica* v. *Yarmark* (1988) 203 Cal.App.3d 153 [249 Cal.Rptr. 732] and *Javidzad* v. *City of Santa Monica* (1988) 204 Cal.App.3d 524 [251 Cal.Rptr. 350]. These cases held the City of Santa Monica's requirement that landlords obtain permits from the city before evicting tenants for the purpose of removing property from the rental housing market invalid to the extent it conflicted with the Act by prohibiting residential landlords from evicting tenants in order to go out of business. The *Yarmark* court stated: "The Ellis Act is a general state law. Together with other statutes governing landlord-tenant relationships, it completely occupies the field of substantive eviction controls over landlords who wish to withdraw *all* accommodations from the residential rental market in order to go out of business." (203 Cal.App.3d at p. 167, fn. omitted.)

*Yarmark* also recognized, however, that the Act "contains explicit boundaries, leaving areas for local control in a fashion consistent with its terms."

(203 Cal.App.3d at p. 167) For example, the Act expressly states that it is not intended to interfere with local governmental authority over land use, including regulation of the conversion of existing housing to condominiums or other subdivided interests, to override procedural protections designed to prevent abuse of the right to evict tenants, to permit an owner to withdraw from rent or lease less than all of the accommodations, to grant public entities additional power with regard to rent control or to diminish such power except as specifically provided. (§ 7060.7.) The Act further states it does not diminish or enhance public entities' power to mitigate adverse impacts on persons displaced by reason of the withdrawal of accommodations from rent or lease (§ 7060.1, subds. (c)(1), (c)(2)) or to grant or deny any entitlement to the use of real property, including planning, zoning, and subdivision map approvals. (§ 7060.1, subd. (b).) The Act expressly does not supersede statutes involving relocation assistance for displaced persons (§ 7260 et seq.), the California Fair Employment and Housing Act (§ 12900 et seq.), unfair competition (Bus. & Prof. Code, § 17200 et seq.), personal rights (Civ. Code, § 43 et seq.), landlord-tenant relationships (Civ. Code, § 1925 et seq.), summary proceedings for obtaining possession of real property (Code Civ. Proc., 1159 et seq.), and community redevelopment (Health & Saf. Code, § 33000 et seq.). (§ 7060.1, subd. (d).) Additionally, the Act contains provisions insuring against removal of rental accommodations in order to avoid rent control ordinances, including subjecting withdrawn accommodations to rent control if offered again for residential purposes (§ 7060.2), and establishes specific guidelines for public entities' enactment of supplemental ordinances consistent with the Act. (§§ 7060.2-7060.5.)

We agree with *Yarmark*'s conclusion that the Act preempts local action with regard to substantive controls over landlords who wish to withdraw all accommodations from the residential rental housing market while specifying areas in which local governments may regulate in a manner consistent with the Act. The question is how the City's notice and relocation payment requirements fit into this scheme.

## II.

Appellant contends that the City's requirement of six months' notice to tenants of a landlord's intention to remove properties from the residential rental housing market conflicts with provisions of the Act which limit allowable notice requirements to 60 days.

The Act authorizes public entities with rent control systems to impose certain requirements with respect to notice of withdrawal of residential rental housing from the market. Section 7060.4 provides in pertinent part:

"(a) Any public entity which, by a valid exercise of its police power, has in effect any control or system of control on the price at which accommodations are offered for rent or lease, may require by statute or ordinance, or by regulation as specified in Section 7060.5, that the owner notify the entity of an intention to withdraw those accommodations from rent or lease and may require that the notice contain statements, under penalty of perjury, providing information on the number of accommodations, the address or location of those accommodations, the name or names of the tenants or lessees of the accommodations, and the rent applicable to each residential rental unit.

"Information respecting the name or names of the tenants, the rent applicable to any residential rental unit, or the total number of accommodations, is confidential information . . . .

"The statute, ordinance, or regulation of the public entity may require that the owner record with the county recorder a memorandum summarizing the provisions, other than the confidential provisions, of the notice in a form which shall be prescribed by the statute, ordinance, or regulation, and require a certification with that notice that actions have been initiated as required by law to terminate any existing tenancies. In that situation, the date on which the accommodations are withdrawn from rent or lease for purposes of this chapter is 60 days from the delivery in person or by first-class mail of that notice to the public entity.

"(b) The statute, ordinance, or regulation of the public entity adopted pursuant to subdivision (a) may also require the owner to notify any tenant or lessee displaced pursuant to this chapter that the public entity has been notified pursuant to subdivision (a), that the notice to the public entity specified the name and the amount of rent paid by the tenant or lessee as an occupant of the accommodations, and the amount of rent the owner specified in the notice to the public entity, together with a notice to the tenant or lessee of his or her rights under paragraph (4) of subdivision (a) of Section 7060.2."

While the first paragraph of section 7060.4, subdivision (a), does not state a time limit for the authorized notice to the public entity, the third paragraph of that subdivision specifies that where, as here, a city includes in its notice ordinance the requirements that the owner record a memorandum summarizing the notice to the public entity and certify that eviction proceedings have been instituted as required by law, the accommodations "are withdrawn from rent or lease" 60 days from the delivery of the notice to the entity. (§ 7060.4, subd. (a) [¶ 3].) Although not worded in the clearest fashion, the practical

effect of this requirement is that "in that situation"—when the recorded memorandum and certification are required—the owner must give notice to the city 60 days prior to withdrawal of the accommodations. The Act's only provision regarding notice to tenants is section 7060.4, subdivision (b), which allows imposition of a requirement that tenants be notified *that the public entity has been notified* of the owner's intention to withdraw accommodations from rent or lease. Since the notice to tenants authorized by subdivision (b) necessarily must be given *after* the notice to the city, it follows that, in this situation, the Act does not allow a requirement of more than 60 days' notice to tenants.

The City urges there is no preemption of its six-month notice requirement because the 60-day provision of section 7060.4, subdivision (a), applies only where a landlord is filing a certification that eviction proceedings have been instituted "as required by law." According to the City, a landlord cannot file the certification required to be filed 60 days before withdrawal of accommodations unless he or she has complied with all laws governing termination of tenancies, including the City's requirement of 6 months' notice to tenants. This argument, however, begs the question whether the Act prohibits the City from requiring more than 60 days' notice. By carefully spelling out certain types of notice which public entities may require, the Act clearly indicates that *only* these types are authorized and other, additional notice requirements are not permissible.

Putting aside the Act, it has been determined that "[l]andlord-tenant relationships are so much affected by statutory timetables governing the parties' respective rights and obligations that a 'patterned approach' by the Legislature appears clear" (*Tri County Apartment Assn.* v. *City of Mountain View* (1987) 196 Cal.App.3d 1283, 1296 [242 Cal.Rptr. 438]) and "the extensive scheduling provided by the Legislature reveals that the timing of landlord-tenant transactions is a matter of statewide concern not amenable to local variations." (*Id.*, at p. 1298.)[2] Without reference to the Act, the notice due a tenant from a landlord wishing to terminate the tenancy is specified in Civil Code section 1946 as at least as long as the term of the tenancy, not exceeding 30 days, or at least 30 days for a month to month tenancy; notice requirements in the case of an unlawful detainer are prescribed by Code of Civil Procedure section 1161. The Act establishes a special circumstance in

---

[2]*Tri County Apartment Assn.* v. *City of Mountain View* held the city's requirement that landlords give 60 days' notice before raising rents directly conflicted with the statewide legislative scheme of timing of landlord-tenant transactions and, specifically, Civil Code section 827. Civil Code section 827 requires landlords to give written notice to tenants of changes in lease terms on expiration of a period at least as long as the term of hire, for tenancies of less than one month, or of at least thirty days for tenancies from month to month. (196 Cal.App.3d at pp. 1296-1298.)

which local governments may impose a longer notice requirement than would otherwise be permissible—the 60 days specified in section 7060.4—but does not authorize further extended notice requirements. The City's six-month notice requirement is preempted by the Act.

The City also urges that the six-month notice requirement should be upheld because the Act expressly states it is not intended to diminish any public entity's power to mitigate any adverse impact on persons displaced by reason of the withdrawal of accommodations from rent or lease. (§ 7060.1, subd. (c)(1), (c)(2).)[3] In the findings adopted by the City as part of chapter 13.77, the City states that there is a continuing housing shortage and low vacancy rate in the city, because of which "it is essential that tenants displaced through the withdrawal of residential rental property from rent or lease be given substantial advance notice to enable them to relocate to other housing." (B.M.C., §§ 13.77.010.B., 13.77.010.C.) The City contends that interpreting section 7060.4 to restrict its ability to require extended notice would be contrary to the Legislative intent expressed in section 7060.1, subdivision (c)(1), and (c)(2), violating the principle that the various parts of a statutory enactment must be harmonized by considering the particular section being construed in the context of the statutory framework as a whole. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230-231 [110 Cal.Rptr. 144, 514 P.2d 1224].) Against the general reservation of power to local governments with respect to mitigation measures, however, section 7060.4 reflects a specific legislative determination that 60 days' notice of intention to withdraw accommodations from the residential rental market is sufficient notice.

The City also suggests that interpreting section 7060.4 to limit its power to require extended notice promotes a lack of harmony with the Act's stated intention not to "[o]verride procedural protections designed to prevent abuse of the right to evict tenants." (§ 7060.7, subd. (2).) The City has made no showing that its six-month notice requirement was aimed at preventing abuse of the right to evict tenants; on the contrary, the findings discussed above demonstrate that the City simply wishes to afford tenants more time to locate replacement housing before their units are withdrawn from the market. Worthy as this goal may be, it conflicts with the notice provisions of the Act, which were calculated to achieve the same purpose, and cannot be sustained.

### III.

▮ Appellant also argues that the City's relocation assistance require-ment is preempted by the Act because the blanket requirement that landlords

---

[3]See discussion of section 7060.1, subdivision (c)(1) and (c)(2), *infra*, at page 98 et seq.

pay $4,500 per unit regardless of the financial situation of the tenants goes beyond the scope of relocation assistance authorized by the Act and compels appellant to remain in the residential rental housing business unless and until it can pay the $148,500 necessary to remove its 33 units from the market. According to appellant, the Act authorizes relocation assistance only to lower income households.

Section 7060.1, subdivision (c)(1), provides as follows: "Notwithstanding Section 7060, nothing in this chapter does any of the following: . . . Diminishes or enhances any power which currently exists or which may hereafter exist in any public entity to mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodations in any residential hotel, as defined by Section 50519 of the Health and Safety Code, which is expressly reserved, or generally used, for occupancy by lower income households, as defined by Section 50079.5 of the Health and Safety Code."[4]

Section 7060.1, subdivision (c)(2), provides: "The reference to residential hotels in paragraph (1) is not intended by the Legislature to diminish or enhance any power which currently exists or which may hereafter exist in any public entity to require those same actions for other types of accommodations."

There seems to be no dispute between the parties either that section 7060.1, subdivision (c)(1), would authorize the City to require landlords to pay relocation assistance to lower income residents of residential hotels when these accommodations are removed from the market, or that subdivision (c)(2) removes some part of the limitation on the City's power to require such mitigation as would otherwise be required by the language of subdivision (c)(1). While the City maintains subdivision (c)(2) allows it to

---

[4]Health and Safety Code section 50519 states legislative findings including that the need for decent housing among individuals of very low and low income is great, that residential hotels are often the only form of housing affordable to these individuals, and that many such hotels are in poor condition and need of rehabilitation, being demolished or converted to other uses. The statute contains the following definition: " 'Residential hotel' means any building containing six or more guestrooms or efficiency units, as defined by Section 17958.1, intended or designed to be used, or which are used, rented, or hired out, to be occupied, or which are occupied, for sleeping purposes by guests, which is also the primary residence of those guests, but does not mean any building containing six or more guestrooms or efficiency units, as defined by Section 17958.1, which is primarily used by transient guests who do not occupy that building as their primary residence." (Health & Saf. Code, § 50519, subd. (b)(1).)

Health and Safety Code section 50079.5 defines "lower income households" as meaning persons and families whose income does not exceed the qualifying limits for lower income families as established and amended from time to time pursuant to section 8 of the United States Housing Act of 1937.

require relocation assistance for *all* displaced tenants, however, appellant contends the statute only allows such assistance for lower income tenants in accommodations other than residential hotels.

Established rules of statutory construction lead us to accept appellant's interpretation of the statute. A "fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) "In construing the words of a statute . . . to discern its purpose, the provisions should be read together; an interpretation which would render terms surplusage should be avoided, and every word should be given some significance, leaving no part useless or devoid of meaning." (*City & County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].) " '[E]very statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect. [Citations.]' " (*Landrum* v. *Superior Court* (1981) 30 Cal.3d 1, 14 [177 Cal.Rptr. 325, 634 P.2d 352]; *Select Base Materials* v. *Board of Equal.*, *supra*, 51 Cal.2d at p. 645.)

 Section 7060.1, subdivision (c)(1), is a carefully worded statute affording protection to a specifically defined group, low income tenants in residential hotels. Respondents' interpretation of section 7060.1, subdivision (c)(2), however, would render subdivision (c)(1) completely meaningless: If subdivision (c)(2) allows cities to require relocation assistance for all displaced tenants, regardless of income, there would be no need to specify that such relocation assistance may be required for low income tenants of residential hotels. Under appellant's interpretation, subdivision (c)(2) retains subdivision (c)(1)'s focus on lower income tenants but clarifies that the specific reference to residential hotels in subdivision (c)(1) does not preclude cities from acting to mitigate the effects of removal of rental housing on lower income tenants in other types of housing.[5]

Appellant's construction of subdivision (c)(2) also serves to effectuate the purpose of the Act. The Act was expressly intended to protect landlords' rights to go out of business (§ 7060.7), to "alleviate the plight of landlords." (*Bullock* v. *City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1096 [271 Cal.Rptr. 44].) To view section 7060.1, subdivision (c)(2) as authorizing cities to require relocation assistance for *all* tenants as a condition of allowing removal of residential rental housing units from the market

---

[5]That the Legislature would specifically clarify local governments' power to require mitigation measures in the case of residential hotels can be explained by the special role such accommodations play as the last resort for certain lower income individuals and families. (See Health and Saf. Code, § 50519, subd. (a); fn. 4, *ante*.)

would be to place a potentially insurmountable obstacle in the path of landlords wishing to leave the business. In this case, appellant would be required to pay $148,500 in relocation assistance in order to remove its 33 units from the market; depending on the landlord's financial situation, such a requirement might well "impose[ ] a prohibitive price on the exercise of the right under the Act." (*Javidzad* v. *City of Santa Monica, supra,* 204 Cal.App.3d at p. 531.)[6] ▮▮▮▮▮▮ In the absence of any indication in the statutory language that the Legislature intended to extend protection to tenants other than the lower income tenants identified in section 7060.1, subdivision (c)(1), we decline to ascribe to the Legislature an intent that would so far interfere with the express purpose of the Act.[7] ▮▮▮ We

---

[6]The cases relied upon by respondent and amici curiae as recognizing local governments' power to require relocation assistance not limited to lower income households (*Briarwood Properties, Ltd.* v. *City of Los Angeles* (1985) 171 Cal.App.3d 1020, 1028-1031 [217 Cal.Rptr. 849] [relocation assistance of $2,500 to "qualified tenants"—over age 62, disabled, or with dependent children—and $1,000 to other tenants]; *Kalaydjian* v. *City of Los Angeles* (1983) 149 Cal.App.3d 690, 693 [197 Cal.Rptr. 149] [same]; *People* v. *H & H Properties* (1984) 154 Cal.App.3d 894, 901 [201 Cal.Rptr. 687] [relocation assistance of $1,000 or monthly rent multiplied by number of years occupied]) predated the Act. Accordingly, they do not constitute authority for the proposition that relocation assistance requirements not limited by income level are allowed under the Act.

[7]Respondents rely upon the declaration of Ray Le Bov, counsel to the Assembly Committee on Judiciary, as evidence that section 7060.1, subdivision (c)(2), was intended to allow cities to require relocation assistance for all displaced tenants, regardless of income. According to Le Bov, after the amendment which became subdivision (c)(1) was proposed to the Judiciary Committee, the legislative advocate for the cities of Berkeley and West Hollywood, Lenny Goldberg, expressed concern that references to "residential hotels" and "low-income households" might be construed as limiting cities' powers to provide mitigation for other types of accommodations and classes of tenants and requested adoption of another amendment stating the residential hotel amendment was not to be so construed. After the two amendments were adopted, Le Bov was instructed to draft the statutory language, which he did with the assistance of others. Le Bov declared that he recalled no discussion by the Judiciary Committee that Goldberg's proposal should be limited "by the residential hotel amendment or by its specific reference to such hotels or to low-income households."

Reliance upon Le Bov's declaration to discern the legislative intent with respect to section 7060.1, subdivision (c)(2), is inappropriate. The declaration expresses Le Bov's understanding of what subdivision (c)(2) was meant to accomplish. Unlike subdivision (c)(1), the actual language of subdivision (c)(2) is ambiguous. There is no evidence Le Bov's view of the meaning of the statute was expressed to the legislators who voted on it; on the contrary, the conference committee report dealing with these amendments states only that "the bill does not affect the power of a public entity to mitigate the effect of displacement from a residential hotel reserved for or used by lower income households." Le Bov's interpretation therefore cannot be taken as evidence of the meaning ascribed to the statute by the Legislature. (See *Walters* v. *Weed* (1988) 45 Cal.3d 1, 10 [246 Cal.Rptr. 5, 752 P.2d 443]; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 590 [128 Cal.Rptr. 427, 546 P.2d 1371].) "The motive or purpose of the drafters of a statute is not relevant to its construction absent reason to conclude that the body which adopted the statute was aware of that purpose and believed the language of the proposal would accomplish it." (*Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 764, fn. 10 [274 Cal.Rptr. 787, 799 P.2d 1220].)

therefore conclude that Berkeley's relocation assistance requirement, not limited to lower income households, violates the Act.

The judgment is reversed. Each party to bear its own costs.

Benson, J., and Peterson, J.,* concurred.

A petition for a rehearing was denied December 9, 1992, and respondents' petition for review by the Supreme Court was denied February 11, 1993.

---

*Presiding Justice of the Court of Appeal, First District, Division Five, sitting under assignment by the Chairperson of the Judicial Council.