[No. A066609. First Dist., Div. Four. July 17, 1995.]

STACY & WITBECK, INC., Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

**COUNSEL**

Louise Renne, City Attorney, George K. Wong and Geoffrey Spellberg, Deputy City Attorneys, for Defendant and Appellant.

Rutan & Tucker, Hans Van Ligten and Matthew McQueen as Amici Curiae on behalf of Defendant and Appellant.

Knecht, Haley, Lawrence & Smith and Richard A. Bunn for Plaintiff and Respondent and as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**ANDERSON, P. J.**—The crux of this appeal is whether a municipality, consistent with applicable ordinances and without overreaching areas occupied by state law, can bar a contractor from bidding on its public works projects for five years, on a declaration of irresponsibility for knowingly

filing a false claim. We conclude it can and reverse the order preliminarily enjoining the City and County of San Francisco (City) and its public utilities commission (PUC) from enforcing the PUC's order against public works contractor Stacy & Witbeck, Inc. (Stacy).

## I. BACKGROUND

The City is a chartered city and county and as such has adopted its own laws requiring competitive bidding on public works contracts involving expenditure of more than $50,000. (San Francisco Administrative Code (SFAC) § 6.1, calling for the letting of such contracts to "the lowest reliable and responsible bidder.") In May 1991, pursuant to its competitive bidding process, the City awarded Stacy and Nationwide Construction Company, its joint venture partner,[1] Muni Contract MR-1038 to construct a double cross-over track system at the Castro Street light rail vehicle station. The contract called for a 10-day continuous shutdown period, but due to delays the shutdown period was extended.

Problems ensued. On December 5, 1991, Stacy served the City with a Government Code claim pertaining to the contract. The following month, on January 14, it submitted a preliminary construction contract claim and request for equitable adjustment to the City. Therein, Stacy indicated that the City's engineer had stated that change order requests had to be pursued via a "Contract Claim" following project completion. Nonetheless, Stacy decided to submit a preliminary breakdown of damages "because the multiplicity of changes to the work made by the City has and is resulting in monumental extra cost to both the Contractor and our Electrical Subcontractor. . . ." "In accordance with the early advice of the Engineer, we hereby submit a description of damages known at this time. We will continue to review and analyze the impact of the City's actions and inactions while work continues on the project. [¶] This letter represents an effort on our part to avoid litigation by way of settling individual and collective issues through the process of negotiation."

Stacy filed suit against the City in March 1992; the City cross-complained and in January 1993 served its third amended cross-complaint alleging therein a cause of action under the False Claims Act, Government Code section 12651 et seq. The superior court granted summary adjudication in favor of Stacy on that particular cause, ruling that the alleged false claim was "absolutely privileged" under Civil Code section 47, subdivision (b), because it was submitted to the City "in anticipation of litigation."

---

[1]Nationwide performed a minimal amount of work on the project.

Meanwhile, the PUC brought an administrative action against Stacy under former section 6.45 of the SFAC (hereafter, section 6.45)[2] to determine whether (1) the contract claim was false; (2) if so, did Stacy knowingly submit it; and (3) if so, should Stacy be declared an irresponsible bidder. Following formal charges and an evidentiary hearing at which Stacy was represented by counsel and presented oral and documentary evidence, the PUC found that Stacy had knowingly and intentionally submitted a false claim, with over $400,000 in costs calculated under an improper methodology.

Specifically, the PUC found that methodology was "unacceptable in the construction industry and . . . was designed to and did yield a greatly inflated labor cost claim. . . . [¶] By Stacy's calculations, its entire workforce was idled or prevented from performing constructive work for over 75% of the shutdown period. However, . . . deposition testimony . . . shows that during the shutdown period Stacy's work crews always had enough work. The calculations also resulted in Stacy claiming that on 5 days of the 14.5 day shutdown period its crews were prevented from working in excess of 24 hours a day, even though there are only 24 hours in a day. [¶] Stacy admits there are errors in the claim and does not contend that the claim contains an accurate accounting of the crew hours allegedly lost as a result of San Francisco's actions. Yet, Stacy never corrected the claim. [¶] As a result of its calculations, Stacy claimed a grossly inflated amount for lost labor costs. Stacy then marked up that inflated amount."

Finally, the PUC deemed Stacy an irresponsible contractor and banned it from bidding on City public works projects for a period of five years, with the caveat that after two years Stacy could apply for reinstatement as a responsible bidder.[3]

Thereafter, Stacy petitioned for injunctive relief. The court granted a preliminary injunction enjoining the City and the PUC from enforcing the irresponsibility order. The court determined that the distortions in the claim did not violate any of the provisions governed by section 6.45 and, hence,

---

[2]This provision read: "In addition to any other penalties herein provided, for the violation of this Article or for the failure of any contractor or subcontractor to abide by the rules and regulations herein contained, any contractor or subcontractor violating the provisions of this Article, or failing to abide by the rules and regulations herein set forth, shall be declared an irresponsible bidder by the officer, board or commission responsible for said public work or improvement; and shall not, for a period of five years thereafter, be allowed to act as a contractor or subcontractor on any public work or improvement for the City and County of San Francisco. . . ."

[3]Although the parties have not raised this issue, we question the source, if any, of the PUC's authority to entertain an application for reinstatement after two years.

the PUC lacked any legal basis for issuing its order. Thus, it was likely that upon final determination of the merits, the PUC would also be found to lack such authority. This appeal followed.

## II. Discussion

### A. *The PUC's Action Was Valid Under the SFAC*

 The City urges that the trial court's construction of the SFAC was incorrect. In other words, the PUC's construction, in a manner that enabled it to proceed against Stacy under section 6.45, was correct. We agree.

The City Charter grants to the PUC charge of the construction, management, operation and control of all public utilities. (City Charter, § 3.591.) The PUC carries out this charge pursuant to chapter 6 of the SFAC, entitled "Contract Procedure." Section 6.45 permitted the PUC to deem a contractor irresponsible for failing to abide by rules and regulations "herein set forth." Manifestly this language meant that section 6.45 applied to any violation of chapter 6, and the PUC so concluded.[4]

Section 6.14 of the SFAC states that the City will not pay any contractor damages or compensation for delays, with the proviso that it may pay for delays caused by the City and for unavoidable delays specifically stated in the contract, the latter delays to be compensated *under the conditions specified in the contract.* Pursuant to SFAC section 6.16, the terms of section 6.14, as well as section 6.9 (delineating a multitude of "unavoidable" delays), were incorporated into the contract. Clause 89 of the contract in turn provided that in order to qualify for additional compensation "for the happening of any event, thing, occurrence, or other cause," the contractor must give written notice of the potential claim, setting forth the reasons the contractor believes extra compensation will or may be due, the nature of the costs involved and, so far as possible, the amount of the potential claim.

---

[4]Stacy contends section 6.45 applied exclusively to regulations regarding working conditions, relying primarily on an analysis of legislative history revealing that the predecessor to section 6.45 was part of an article in another code pertaining to working conditions. But the provision ultimately found a new home in the more broadly concerned chapter 6 ("Contract Procedure"). There are no articles or other subdivisions in chapter 6 and, thus, the retention of the reference to "Article" in section 6.45 has no referent or meaning. The rules and regulations "herein contained" by the plain terms of the ordinance refer to the rules and regulations embodied in chapter 6.

Stacy also maintains that the preamble to the ordinance which restructured the provision in question supports its interpretation. That preamble states that the ordinance amends the SFAC "by adding sections 6.34 through 6.53 to Chapter 6 thereof, relating to regulations in regard to working conditions and subcontracts. . . ." Stacy's argument is not compelling. To reiterate: section 6.45 was newly integrated into the *broader* chapter 6 dealing with "Contract Procedure," and the plain language of the ordinance makes it applicable to the entire chapter.

The PUC held that the covenant of good faith and fair dealing was an implicit requirement of clause 89 and, thus, of section 6.14 of chapter 6.[5] We agree. The law implies a covenant of good faith and fair dealing in *every* contract. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158].) Pursuing this reasoning, clause 89 of the contract required Stacy to make a good faith evaluation of the amount of the potential claim. The act of knowingly filing a false claim constituted a breach of the covenant and a violation of section 6.14 of the SFAC.

Stacy's counterpoint is that the PUC is not empowered to create a policy which SFAC section 6.14 does not embody, that it cannot imply new duties into the ordinance. ■ "Ordinances, to be valid and effectual, must set forth with clarity some norm or standard by which all persons may know their rights and obligations thereunder. Where an ordinance commits its application to municipal officials, it should set up a uniform standard or rule of conduct. [Citation.] Regulations prescribed by ordinance must be clear, definite, and specific in their application and operation, and their application may not be left to the caprice of enforcement officers." (*Agnew* v. *City of Culver City* (1956) 147 Cal.App.2d 144, 153-154 [304 P.2d 788].)

■ The ordinance in question in *Agnew* conferred on electrical inspectors the power to create an offense to which criminal sanctions attached, with no ascertainable standard for governing the electrical contractors subject to the ordinance. Stacy's argument is that the path from section 6.45 to section 6.14 of the SFAC to clause 89 of the contract to the implied covenant of good faith and fair dealing is so convoluted as to constitute an impermissibly vague standard for governing contractors. We are not persuaded that the *Agnew* analysis applies to chapter 6 of the SFAC.

---

[5]Stacy focuses on the fact that clause 89 of the contract states that compliance with the notice of potential claim requirements *"shall not be a prerequisite* as to matters within the scope of the protest provisions in Section 75, 'Notice of Delay.' " (Italics added.) Clause 75 requires the contractor to promptly notify the PUC of all *anticipated* delays in prosecution of the work; when the notice requests an extension and sets forth an estimate of the additional time required, with recital of causes of unavoidable delays relied upon, the notice constitutes an application for extension of time. First, not all delays are anticipated and, thus, unanticipated delays would not come within the scope of clause 75. Second, matters covered by clause 75 are notices of anticipated delays and extensions, not extra compensation for unavoidable delays or delays caused by the City, many of which might not be anticipated. Third, assuming for purposes of argument that compliance with section 89 might not be a prerequisite for every potential claim identified in Stacy's claim, the fact of the matter is that Stacy and the City operated as if it were. Once Stacy committed to submitting all requests for additional compensation pursuant to the potential claim procedure, it was obligated to do so in good faith.

The City pushes for a broad rather than narrow construction of chapter 6 and, in particular, section 6.45, noting that the underlying intent of the legislation was not to punish individuals but to accomplish the legitimate governmental purpose of protecting the public when it engaged in business with building contractors. (See *Viking Pools, Inc.* v. *Maloney* (1989) 48 Cal.3d 602, 607, fn. 4 [257 Cal.Rptr. 320, 770 P.2d 732].) Where this is the purpose, we must afford the statute a reasonable and practical construction. (*Ibid.*) Under this reasoning we conclude that rather than making new law or amending chapter 6, the PUC, in implying therein the covenant of good faith and fair dealing, was merely broadly construing the statute to achieve its nonpenal purposes. To reiterate, the covenant of good faith and fair dealing applies to *all* contracts in California. Breach of a specific contractual provision is not necessary to establish breach of the covenant. (*Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373 [6 Cal.Rptr.2d 467, 826 P.2d 710].) In our view it does not take a genius to know that dishonesty in submission of claims pursuant to agreed procedures, clearly a breach of the covenant of good faith and fair dealing, would subject a contractor to sanctions under section 6.45

Finally, Stacy invokes Civil Code section 1670 to assert that the PUC has no authority to punish a contractor for violating the covenant of good faith and fair dealing. That statute provides: "Any dispute arising from a construction contract with a public agency, which contract contains a provision that one party to the contract or one party's agent or employee shall decide any disputes arising under that contract, shall be resolved by submitting the dispute to independent arbitration, if mutually agreeable, otherwise by litigation in a court of competent jurisdiction."

First, Stacy points to no provision in the contract making the PUC the sole arbiter of disputes thereunder. Second, the PUC was not resolving a contract dispute at all. The administrative action addressed Stacy's ability to bid on future City public works contracts; it did not adjudicate or otherwise determine Stacy's rights under contract No. MR-1038. Those claims Stacy litigated in court. Apparently, that litigation has recently settled with mutual dismissal of all claims save for the court's earlier summary adjudication order on the False Claims Act cause of action.

### B. *The Appeal Is Not Void*

Stacy raises a number of additional bases for affirming the judgment. The first has to do with the fact that section 6.45 has been repealed. From this Stacy extrapolates that the City's appeal is void.

" '[A] cause of action or remedy dependent on a statute falls with a repeal of the statute, even after the action thereon is pending, in the absence of a saving clause in the repealing statute." (*Governing Board* v. *Mann* (1977) 18 Cal.3d 819, 829 [135 Cal.Rptr. 526, 558 P.2d 1].) What Stacy fails to point out is that pursuant to ordinance No. 308-04, the City deleted section 6.45 and other provisions, but simultaneously added new sections including section 6.58 which preserves, in substantially the same form, the gist of section 6.45. " 'When a repealing act embraces provisions of the repealed act, it continues in operation the re-enacted parts without interruption. All rights and liabilities that have accrued under the former act are preserved.' " (*People* v. *Risley* (1963) 213 Cal.App.2d 219, 227 [28 Cal.Rptr. 568].)

The new ordinance details civil penalties for filing false claims, subjects all contractors to the covenant of good faith and fair dealing in their contractual relations with the City and makes violation of that covenant explicitly a basis for being deemed an irresponsible contractor. Stacy argues that these additions exhibit an intent on the part of the board of supervisors to grant new disciplinary powers to the PUC, which in turn indicates that those powers did not previously exist under section 6.45. Not so. The new legislation merely expands and clarifies the powers that were already there.

### C. *Section 6.45 Was Constitutional*

■ Stacy further attacks section 6.45 as facially unconstitutional in that it did not specifically delineate procedures for notice and a hearing.[6] These concerns speak to the administration and application of the ordinance. It is

---

[6] Due process safeguards of course are only required to protect the constitutionally honored interests of life, liberty and property. To demonstrate a constitutionally protected property interest in the award of a municipal contract, the contractor must show he or she has a legitimate claim or entitlement to that contract. (*Kim Const.* v. *Bd. of Tr. of Village of Mundelein* (7th Cir. 1994) 14 F.3d 1243, 1245.) But there is no entitlement and no protected interest here because all that is affected is Stacy's interest in bidding on future public works projects in the City. Stacy's argument to the contrary is not persuasive because it relies on inapposite authority involving vested, fundamental rights.

More complex is the question whether section 6.45 impacted protected liberty interests. *Paul* v. *Davis* (1976) 424 U.S. 693 [47 L.Ed.2d 405, 96 S.Ct. 1155] and *Siegert* v. *Gilley* (1991) 500 U.S. 226 [114 L.Ed.2d 277, 111 S.Ct. 1789] teach us that government infliction of a stigma to one's reputation, standing alone, will not support a liberty claim based on employment foreclosure. "[R]eputation alone, apart from some more tangible interests such as employment," is not encompassed in the concept of liberty at all. (*Paul* v. *Davis, supra,* 424 U.S. at p. 701 [47 L.Ed.2d at p. 414].) As recently explained in *Taylor* v. *Resolution Trust Corp.* (D.C. Cir. 1995) 56 F.3d 1497, 1506: "To prove constitutional injury, the plaintiff must show not only that the government has imposed some stigma upon him, but also that it has worked some change in his status under law." The court in *Taylor* went on to delineate two ways in which the government's action could result in change of status sufficient to invoke a liberty interest: (1) if the action formally or automatically excludes the plaintiff from work on

apparent from the record that the PUC had a procedure for implementing section 6.45 that afforded the contractor notice and a hearing. All presumptions and intendments favor the validity of statutes and they will be upheld unless their unconstitutionality clearly and unmistakenly appears. (*Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 814 [258 Cal.Rptr. 161, 771 P.2d 1247].) Here, the absence of procedures *in the ordinance* did not invalidate the underlying grant of authority to boards and commissions to declare contractors irresponsible.

### D. *The Hearing Procedures Were Fair*

In addition, Stacy complains that (1) the PUC hearing did not allow cross-examination of witnesses by the parties; (2) it was denied the ability to compel witnesses; (3) important documents given to the PUC were withheld; and (4) the PUC was biased.

First, the full panoply of judicial trial procedures, such as cross-examination, is not constitutionally required. Reviewing the due process safeguards necessary to protect a government contractor facing suspension or debarment, the court in *Transco Sec., Inc. of Ohio* v. *Freeman* (6th Cir. 1981) 639 F.2d 318 had this to say: "One who has been dealing with the government on an ongoing basis may not be blacklisted, whether by suspension or debarment, without being afforded procedural safeguards including notice of the charges, an opportunity to rebut those charges, and under most circumstances, a hearing." (*Id.*, at p. 321.) The issue in *Transco* was adequacy of procedures when the contractor was denied a hearing because a hearing would adversely affect possible civil or criminal prosecution. In those cases, contractors were nonetheless given an opportunity to present information or argument, in person, in writing, or through representation, in opposition to the suspension. This opportunity, coupled with proper notice, in most instances would survive a due process challenge. (*Id.*, at pp. 322-323.)

Here, Stacy received notice of hearing, notice of charges, advance synopsis of evidence, opportunity to present witnesses and documentary evidence, and the right to presence of counsel. Moreover, Stacy was afforded the opportunity to (and did) depose the City's single witness prior to the hearing, and to submit the transcript to the PUC (it did not, but the City did

a category of future public contracts or other government employment opportunities; or (2) if the action precludes the plaintiff from such a broad spectrum of opportunities that it interferes with the right to follow a chosen profession or trade. (*Id.* at p. 1506, citing *Kartseva* v. *Department of State* (D.C.Cir. 1994) 37 F.3d 1524 [308 App.D.C. 397].) Here, Stacy's liberty interest was implicated under the first test because the PUC's formal action excluded Stacy from all public works contracting in the City for a period of two to five years.

submit a portion thereof). With all these safeguards, the denial of cross-examination of witnesses did not amount to denial of due process.

Second, with respect to Stacy's bald accusation that the PUC "failed" to compel witnesses to testify, the record shows that Stacy called two City employees to testify and, on the other hand, did not identify any witness that it wanted to call but could not. Additionally, Stacy submitted deposition testimony of City employees; we have no record that Stacy ever requested that they testify.

Next, documents given to the PUC but not to Stacy had to do with the proposed settlement in Stacy's action against the City and were not part of the materials provided the PUC in connection with the false claims administrative action. In President Yu's opening statement, she acknowledged that the PUC had "some knowledge" of the case because the City and Stacy "have been involved in litigation over this project and the commission is legally required to approve or disapprove all settlement proposals which have been offered during the litigation. However, the commission has not, in any way, prejudged or determined the charges that are before us today. *The commission recognizes that any decision made by the commission must be based solely on the oral and written evidence presented in this hearing.*" (Italics added.) The factual findings issued by the PUC reflect that they are based on the facts presented in the administrative proceeding. There is no indication that confidential information provided the PUC in the litigation was relied on to support factual findings in the administrative action.

Finally, Stacy also launches a claim of actual bias because the PUC was its direct adversary in ongoing litigation, namely, the settlement of Stacy's underlying suit against the City. Stacy suggests that the record establishes that the PUC prejudged the case because of prior participation as an accuser, investigator and initial decisionmaker, citing *Hackethal* v. *California Medical Assn.* (1982) 138 Cal.App.3d 435, 443-444 [187 Cal.Rptr. 811].

*Hackethal* involved the procedure of a private organization in deciding to exclude or expel a member. The organization's bylaws gave the accused the right to challenge panel members. The reviewing court identified a number of situations where the probability of actual bias on the part of a panel member should afford the accused a practical method, such as voir dire, for testing impartiality. These include situations where a panel member is enmeshed in other matters involving the accused or may have prejudged the case because of a prior participation as an accuser, investigator, fact finder or initial decisionmaker.

Rather than requesting permission to voir dire the commissioners, Stacy treated actual bias and prejudice as *proven* and moved that the entire PUC disqualify itself. When the city attorney suggested that the hearing be conducted by an independent auditor,[7] Stacy objected on grounds there was no legal basis for the PUC to proceed with the charges and, therefore, the administrative action should be dismissed. That objection was sent to the PUC. In a closed executive session, the PUC determined there was no merit to Stacy's claim that the PUC could not proceed; the PUC also declined to pursue the additional charges requested by the city attorney. From this we conclude that Stacy has waived its right to assert a bias claim because it foreclosed the alternative of an independent auditor and never attempted to voir dire the panel.

Stacy's further charge that the city attorney's office engaged in improper ex parte communication with the PUC is not supported by any citation to the record. Finally, the allegation that the PUC action in and of itself violated Stacy's constitutional right to access to the courts because it was instituted for retaliatory purposes after the PUC lost in superior court is nothing more than hyperbole. The PUC lost in superior court because of the litigation privilege, not because of the substance of the false claim allegations. And, as we will discuss, the litigation privilege does not and should not apply to prevent administrative agencies from pursuing disciplinary and related actions.

### E. *The Litigation Privilege Is No Bar to the PUC Action*

 Stacy also defends the injunctive order on the theory that the contract claim was filed in anticipation of litigation and, thus, was absolutely privileged under Civil Code section 47, subdivision (b). That being the case, Stacy concludes the claim could not serve as the basis for any administrative action conducted by the PUC. The PUC found to the contrary that "the false claim was submitted to San Francisco as part of the customary construction claims procedure which requires a contractor to advise San Francisco if the contractor is seeking additional compensation under the contract. The contract claims procedure is set out at section 89 of Contract No. MR-1038."

Indeed, in setting forth why Stacy submitted the claim, the company's president explained that in an early meeting with the City, the City's engineer said there would be "absolutely no change orders issued. This was not in the specs." The City's on-the-job manager then related that "any

---

[7]The City sought to add charges against Stacy of a nature which *required* findings to be made by an independent auditor. Construing Stacy's procedural concerns as a request for an independent auditor, the City then requested that such an auditor hear *all* the charges.

change orders or legitimate extra work, we won't address as a change order, which is what the spec says. You have to put everything in a claim, present the claim, we will sit down and negotiate. [¶] So this is what we did. . . . So we went . . . , we submitted a claim for—and this is what is on the table here. We submitted a claim fastly, with people that weren't on the job. . . . We put together a claim to sit down and negotiate with the people on the job." And further: "So by sitting down, putting a claim in—not for a legal claim, and this is exactly what I told in my deposition. That this claim was put there because we were directed by Mr. Highfill to do it and they would look at it, we would get together and we would settle our differences, and this never happened."

Both Stacy's and the PUC's positions are too simplistic. Stacy always harbored thoughts of litigating because a month or so before submitting the contract claim, it presented a claim against the City pursuant to Government Code section 900 et seq. The contract claim, in addition to complying with the City's procedure for determining additional compensation, also served to document and detail the damages for alleged breaches of the contract. Once the City rejected the Government Code claim, Stacy proceeded with litigation.

These facts crystallize a first impression issue: whether a publication filed for dual purposes is privileged in both the judicial and administrative arenas. We have found no case law on point.

■ Civil Code section 47, subdivision (b), furthers the policy of affording litigants and witnesses unimpeded access to our courts without fear of harassment from derivative tort actions. The assumption necessitating this policy is that the external threat of liability would undermine the open communication so essential to the effective administration of justice. (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 213 [266 Cal.Rptr. 638, 786 P.2d 365].) Thus, the privilege operates as a limitation on *civil liability* stemming from the protected communication, precluding the use of such communications as the basis for any *tort action* save malicious prosecution. (See *id.*, at pp. 215-216.)

More recently, in *Rubin* v. *Green* (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044] our Supreme Court allowed that communicative conduct otherwise within the scope of Civil Code section 47, subdivision (b), and, thus, absolutely immune from civil tort liability should also be immune from injunctive relief. (*Rubin* v. *Green, supra*, 4 Cal.4th at pp. 1201, 1203.) "If the policies underlying section 47(b) are sufficiently strong to support an absolute privilege, the resulting immunity should not evaporate merely

because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from identical conduct as that protected by section 47(b)."

However, Civil Code section 47, subdivision (b), encompasses only the communicative act; it does not privilege tortious courses of conduct. (*Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 211 [271 Cal.Rptr. 191, 793 P.2d 524]; *Kupiec* v. *American Internat. Adjustment Co.* (1991) 235 Cal.App.3d 1326, 1331 [1 Cal.Rptr.2d 371].) Where, for instance, damages are sought not for injuries arising from the broadcast or publication of private conversations but for the recording of them, the privilege does not apply. (*Kimmel* v. *Goland, supra*, 51 Cal. 3d at p. 212.) And, although section 47, subdivision (b), bars certain tort causes of action predicated on a judicial statement or publication, it does not create an evidentiary privilege for those statements. (*Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal. 3d 1157, 1168 [232 Cal.Rptr. 567, 728 P.2d 1202].) Thus, as an example, those statements can be used for evidentiary purposes to determine a person's intent.

 Unquestionably Stacy submitted the contract claim for overages according to the administrative procedures prescribed by the City and for the purpose of pursuing and obtaining additional compensation. This purpose was independent of the purpose of pursuing legal action against the City. To rule that the litigation privilege would bar administrative actions by public entities when the publication was submitted to the entity for a nonlitigation purpose does not make sense. An agency should not be hamstrung from fulfilling its oversight duties simply because the target of the administrative action also contemplated litigation.

We realize that in *Rubin* v. *Green* the Supreme Court resolved that the litigation privilege should also bar injunctive relief if based on the same communicative act that would bar a tort suit. However, that rule is still couched within the context of civil litigation. To expand the statutory immunity to bar the use of otherwise privileged communications in disciplinary and related administrative proceedings reaches too far. Moreover, the statutory scheme does not contemplate that broad a sweep. Section 47 is found in division 1, part 2 of the Civil Code entitled "Personal Rights." That part defines various personal rights and also prescribes certain claims and wrongs which are not judicially actionable and which do not give rise to civil liability. Part 2 on its face has no applicability to administrative actions and proceedings.

What is at stake here is the PUC's ability to do its job—to monitor contractors who do work with the City and hold them accountable for their

business practices, including the integrity of the claims they file for overages. To reiterate, by charter the PUC is given authority over the construction, management, supervision, operation and control of all public utilities. (City Charter, § 3.591.) We find no indication that the Legislature intended that Civil Code section 47 restrict local entities such as the PUC in carrying out their charges.

### F. State Law Does Not Preempt Section 6.45 or the PUC's Action Thereunder

■ Stacy has consistently urged that the Contractors' License Law (Bus. & Prof. Code, § 7000 et seq.) fully occupies and preempts the field of qualifying and disciplining construction contractors, and that local regulations relating to the qualification and discipline of construction contractors are unconstitutional, invalid and unenforceable. Stacy posits that only the Contractors' State License Board (Board) can discipline errant contractors for knowingly submitting false claims. The practical effect of the PUC decision, Stacy argues, is to deprive the contractor of its license with respect to all City jobs, which in turn comprise the vast bulk of its work. Public works contracting is a "portion" of the work Stacy does and the City cannot act to prevent it from pursuing that work.

■ " 'Local legislation in conflict with general law is void. Conflict exists if the ordinance duplicates [citations], contradicts [citation], or enters an area fully occupied by general law, either expressly or by legislative implication [citation].' " (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 484 [204 Cal.Rptr. 897, 683 P.2d 1150].)

■ With respect to the general law concerning contractors, two provisions are important. First, Business and Professions Code section 7032 makes it clear that municipalities maintain their authority to enact ordinances requiring building permits and inspections; however, there is a caveat: "Nothing contained in this section shall be construed as authorizing a city or county to enact regulations relating to the qualifications necessary to engage in the business of contracting." This provision is declaratory of prior case law which firmly established that our state licensing laws fully occupy the field of licensing contractors and, therefore, local ordinances which conflict with or substantially duplicate the state statutory scheme are invalid. (*Agnew* v. *City of Los Angeles* (1958) 51 Cal.2d 1, 6 [330 P.2d 385]; *Horwith* v. *City of Fresno* (1946) 74 Cal.App.2d 443, 448-449 [168 P.2d 767]; see also 42 Ops.Cal.Atty.Gen. 118, 121-122 (1963).)

Second, Business and Professions Code section 460 states: "No city or county shall prohibit a person, authorized by one of the agencies in the

Department of Consumer Affairs by a license, certificate, or other such means to engage in a particular business, from engaging in that business, occupation or profession *or any portion thereof.* Nothing in this section shall prohibit any city or county or city and county from levying a business license tax solely for revenue purposes nor any city or county from levying a license tax solely for the purpose of covering the cost of regulation." (Italics added.)

On the other hand, some local regulation affecting contractors is permitted under the police power. The question under consideration is whether a municipality can temporarily preclude a dishonest contractor from bidding on that municipality's public works projects; or, does the power to act in this disciplinary manner interfere with the state's sole power to qualify and license contractors?

A snapshot of the particular state laws that regulate contractors is helpful in resolving this preemption issue. First, the registrar[8] of the Board, upon complaint or on his own motion, is empowered to investigate actions of any contractor and to cite, temporarily suspend or permanently revoke the license of any contractor who commits "any one or more of the acts or omissions constituting causes for disciplinary action." (Bus. & Prof. Code, § 7090.) These acts are enumerated in Business and Professions Code sections 7107 through 7123.5 and include acts of dishonesty such as diversion of funds (*id.*, at § 7108), substantially injuring another (*id.*, at § 7116) and false denial of a valid claim (*id.*, at § 7120). The power to cite includes the power to order correction or payment to the injured party in lieu of correction, and the power to assess civil penalties. (*Id.*, at § 7099.)

Under certain circumstances the Board itself can suspend or revoke a license and it can also publicly reprove a licensee for any act which would be grounds for suspension or revocation. (Bus. & Prof. Code, § 495.)

In addition to the disciplinary authority vested in the Board and its registrar, under the False Claims Act (Gov. Code, § 12651 et seq.) *any person* who knowingly presents a false claim to a public entity is subject to that entity for treble damages, costs of suit and the possibility of civil penalties up to $10,000 for each claim. (Gov. Code, § 12651, subd. (a)(1).) "Any person" of course would include a public works contractor. The prosecuting authority of a political subdivision shall investigate violations involving the subdivision's funds, and can instigate a civil action against the offender under Government Code section 12652. (Gov. Code, § 12652, subd. (b)(1).)

---

[8]The Board appoints a registrar of contractors who serves as the executive officer and secretary of the Board. (Bus. & Prof. Code, § 7011.)

Finally, under the State Contract Act (Pub. Contract Code, § 10100 et seq.), any state agency can suspend (for up to three years) a contractor from bidding on or being awarded a public works contract with that agency if that person has been convicted of fraud, bribery, collusion, etc., in connection with any public works contract. (Pub. Contract Code, § 10285.1.) The act provides for notice and a hearing prior to any suspension. (*Id.*, at § 10285.2.) It is obvious from these provisions of the False Claim and State Contract Acts that censorship of contractors does not lie exclusively with the Board and registrar.

### a. *Section 6.45 Did Not Duplicate State Law*

There is *no* state law comparable to Public Contract Code section 10285.1 that details remedies for counties and cities in dealing with errant public works contractors in a competitive bidding situation. Therefore, section 6.45, which empowered the appropriate City agency to make a determination of nonresponsibility and then impose a moratorium on accepting bids from contractors known to be dishonest, did not duplicate state law. To the contrary, it merely provided a means for implementing the City's own competitive bidding mandate to award public works contracts to the lowest "reliable and responsible" bidder. (SFAC, § 6.1.)[9]

 "The expenditure of city funds on a city's public works project is a municipal affair." (*Domar Electric Inc.* v. *City of Los Angeles* (1994) 9 Cal.4th 161, 170-171 [36 Cal.Rptr.2d 521, 885 P.2d 934].) Thus, it is within the purview of a chartered city's ample autonomy over municipal affairs to enact a comprehensive program designed to achieve the fiscally sound purposes of competetive bidding. Competetive bidding laws are passed for the benefit and protection of the taxpaying public, not for the benefit and enrichment of bidders. (*Id.*, at p. 173.) Their purposes, among others, are

---

[9]Note that competetive bidding requirements for *general law* cities and counties are governed by the Local Agency Public Construction Act, Public Contract Code section 20100 et seq. Sections 20128 (counties) and 20162 (cities) thereof require contracts to be let "to the lowest responsible bidder." Of necessity general law municipalities have discretion to determine which bidders are "responsible." (*Boydston* v. *Napa Sanitation Dist.* (1990) 222 Cal.App.3d 1362 [272 Cal.Rptr. 458]; *West* v. *Oakland* (1916) 30 Cal.App. 556, 560-561 [159 P. 202].) "Responsibility" is a qualitative term embracing the attribute of trustworthiness as well as the quality, fitness and capacity of the bidder to perform the job satisfactorily. (*City of Inglewood-L.A. County Civic Auth.* v. *Superior Court, supra*, 7 Cal.3d 861, 867, interpreting former Gov. Code, § 25454 [now Pub. Contract Code, § 20128].) Since the Local Agency Public Construction Act does not detail what responsibilty or the absence thereof entails, by implication that job is left to general law municipalities in their charge to implement the state-mandated public bidding requirements. Hence protective legislation similar to section 6.45, enacted by general law cities and counties to minimize the losses inherent in continued dealings with dishonest contractors, likewise would be a valid exercise of their police power and nonduplicative of the general law.

" 'to guard against favoritism, improvidence, extravagance, fraud and corruption; to prevent the waste of public funds; and to obtain the best economic result for the public' [citations]. . . ." (*Ibid.*) ██ Seen in this light, section 6.45 enabled the City to protect the public purse as it sought to accomplish the municipal purposes of its competitive bidding laws. It was not remotely inconsistent with any state law.

### b. *Section 6.45 Did Not Contradict State Law*

Stacy also maintains that the PUC order contradicts Business and Professions Code section 460 because in effect it prohibits Stacy from engaging in "a portion of" its business, namely, public contracting with the City. Our reading of Business and Professions Code section 460 is that the City cannot prohibit a licensed contractor from practicing any aspect of contracting work that falls within the perimeter of the state license. (See 73 Ops.Cal.Atty.Gen. 28, 40 (1990): "This section would preclude a [municipality] from prohibiting those licensed by the . . . Contractors State License Board . . . from practicing their professions and occupations within the scope of their respective licenses without further regulation by the [municipality] except for a business tax for revenue purposes.")

Under this interpretation, a city or county cannot prevent a contractor from practicing his or her profession with respect to third parties. However, when the local entity acts to protect its public purse solely by refusing, on its own behalf, to continue doing business with an irresponsible contractor for up to five years, Business and Professions Code section 460 would not apply. Although the impact of the PUC ruling may be harsh, the order did not suspend, revoke or otherwise affect Stacy's license or curtail the geographic area within which Stacy could seek to work. Stacy can still work in San Francisco and can bid on public projects in other jurisdictions.[10]

### c. *Section 6.45 Did Not Enter a Field Fully Occupied by State Law*

Nor does the ordinance enter an area fully occupied by general law. ██ Preemption (by implication) of an area of law to the exclusion of local regulation will be found where " '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been

---

[10]For this same reason, the effect of the ordinance in question also differs from that struck down in *City and County of San Francisco* v. *Boss* (1948) 83 Cal.App.2d 445, 451-452 [189 P.2d 32].) There, the ordinance limited a contractor's right to contract *in San Francisco* unless he or she also obtained a San Francisco license. That license in turn could be canceled for any act showing the contractor to be dishonest or for violating applicable state or local rules and regulations.

partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local law on the transient citizens of the state outweighs the possible benefit to the municipality.' " (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d at p. 485, quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809].)

 None of these circumstances apply. While disciplinary action affecting the licensing stature of a contractor clearly is fully and completely covered by general law, the matter of how municipalities interpret and carry out their duties under the competitive bidding mandates of their own charter or the Public Contract Code is not. Further, there is nothing in the general law indicating that local regulation in the area of controlling future contract relations with public works contractors would be an anathema. And finally, since the local regulation only goes to the City's own business dealings with contractors and not to any third party relationship, it is difficult to view this as a matter in which transient citizens of the state would be particularly concerned.

We reverse the order granting the preliminary injunction. Parties to bear their own costs on appeal.

Poché, J., and Perley, J., concurred.

A petition for a rehearing was denied August 16, 1995, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied September 7, 1995.