[No. A069340. First Dist., Div. Four. July 2, 1996.]

STACY & WITBECK, INC., et al., Plaintiffs and Respondents, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

**COUNSEL**

Louise H. Rene, City Attorney, Dennis Aftergut, Chief Assistant City Attorney, and Sheryl L. Bregman, Deputy City Attorney, for Defendant and Appellant.

Geoffrey Spellberg as Amicus Curiae on behalf of Defendant and Appellant.

Stanton, Kay & Watson and Richard A. Bunn for Plaintiffs and Respondents.

McInerney & Dillon, William H. McInerney and Carol K. Watson as Amici Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

**ANDERSON, P. J.**—This appeal involves the second prong of the question posed in *Stacy & Witbeck, Inc.* v. *City and County of San Francisco* (1995) 36 Cal.App.4th 1074 [42 Cal.Rptr.2d 805] (*Stacy I*):[1] whether a publication filed for a litigation and a nonlitigation purpose is privileged in both the judicial and administrative arenas. The publication in question is a contract claim for overages purportedly incurred on a public works project. In *Stacy I* we held that the litigation privilege did not bar use of the publication in an

---

[1]As in *Stacy I*, defendant and appellant herein is City and County of San Francisco (City); plaintiffs and respondents are Stacy & Witbeck, Inc., and Nationwide Construction Company, Inc. (Stacy).

administrative action to declare a contractor an irresponsible bidder due to its filing a false claim with the contracting municipality.

Today we hold that the municipality can prosecute a judicial action under the False Claims Act[2] based on that same contract claim. Accordingly, we reverse the judgment in favor of the contractor.

## I. BACKGROUND

In May 1991, pursuant to its competitive bidding process, the City awarded Stacy a contract to construct a project known as Muni Metro System Castro No. 10 Double Crossover (the Muni Project). Clause 89 of the contract specified that as a prerequisite to entitlement to additional compensation "for the happening of any event, thing, occurrence, or other cause," the contractor must give written notice of the potential claim to the engineer, setting forth the reasons the contractor believes additional compensation will or may be due, the nature of the costs involved and, so far as possible, the amount of the potential claim.[3]

Problems developed with the Muni Project. On December 5, 1991, Stacy served the City with a Government Code claim asking for damages for breach of contract. Breaches were described in general terms.

Then, on January 14, 1992, Stacy submitted to the City a preliminary construction contract claim and request for equitable contract adjustment. In the cover letter Stacy explained that the city engineer advised the contractor that change order requests would be subject to a "Contract Claim" procedure following project completion. Nonetheless, Stacy decided to submit a preliminary breakdown of damages "because the multiplicity of Changes to the work made by the City has and is resulting in monumental extra cost. . . . We have made every effort to keep the City abreast of these changes and concomitant Potential Claims in accordance with the Change provisions of the Contract. [¶] In accordance with the early advice of the Engineer, we hereby submit a description of damages known at this time. . . . [¶] This letter represents an effort on our part to avoid litigation by way of settling individual and collective issues through the process of negotiation."

David Stacy, president of Stacy, testified in deposition that the City's manager for the job said any legitimate extra work would have to be

---

[2]Government Code section 12650 et seq. (hereafter FCA).
Unless otherwise indicated, all further statutory references are to the Government Code.
[3]The intention of clause 89, as recited therein, was "that difference[s] between the parties arising under and by virtue of the contract be brought to the attention of the Engineer at the earliest possible time in order that such matters may be settled, if possible, or other appropriate action promptly taken."

presented as a claim, and the parties would "sit down and negotiate." So, they "submitted a claim fastly [*sic*]." And further: "So by sitting down, putting a claim in—not for a legal claim, and this is exactly what I told in my deposition. That this claim was put there because we were directed by Mr. Highfill [from the City] to do it and they would look at it, we would get together and we would settle our differences, and this never happened." "We were directed by the city to submit our legitimate changes as a claim."

Stacy sued the City in March 1992. The City cross-complained and, in its third amended pleading filed January 1993, alleged a cause of action under the FCA.[4] The court granted summary adjudication in favor of Stacy on this cause of action, ruling that the alleged false claim was "absolutely privileged" under Civil Code section 47, subdivision (b), because it was submitted to the City in anticipation of litigation. Judgment was entered accordingly.

## II. DISCUSSION

### A. *The Litigation Privilege Is No Impediment to City's FCA Cause of Action*

The issue on appeal is whether the litigation privilege, found at Civil Code section 47, subdivision (b),[5] precludes the City's FCA cause of action. We conclude it does not.

The absolute protection under section 47(b) covers any publication or statement "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action." (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638,

---

[4]The FCA imposes substantial liability, including treble damages, on any person who knowingly presents a false claim for payment to the state or any political subdivision. (§§ 12650, 12651.)

Specifically, the eighth cause of action recited that in its contract claim Stacy contended that on a number of days, entire crews were prevented from working on the project because of the City's actions. According to the cross-complaint, on some of those days, Stacy asserted that crews "were precluded from working in excess of 24 hours in a period of time that is at maximum 24 hours. In some or all cases, any difficulties on the job site did not prevent a [*sic*] entire crew from working. The use of a 'crew hour' as the time standard for lost work constitutes a false claim as [Stacy] did not lose the ability to have some or all of the crew provide work services on the job when difficulties arose." Additionally, the eighth cause alleged that Stacy's application of a 5 percent mark-up for certain work attributed to the entire joint venture claim also constituted a false claim.

[5]The statute provides: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any . . . (2) judicial proceeding. . . ." (Civ. Code, § 47, subd. (b) (hereafter, section 47(b)).)

786 P.2d 365].) Moreover, publications in the course of a judicial proceeding can include communications made *prior to* commencement of a lawsuit. (*Wilton* v. *Mountain Wood Homeowners Assn.* (1993) 18 Cal.App.4th 565, 569 [22 Cal.Rptr.2d 471].)

The privilege furthers the policy of affording litigants and witnesses unimpeded access to our courts without fear of harassment from derivative tort suits. The assumption is that the external threat of liability will undermine the free communication so essential to the effective administration of justice. The privilege limits civil liability stemming from the protected communication, precluding the use of such communication as the basis for any tort action, save malicious prosecution. (*Silberg* v. *Anderson, supra,* 50 Cal.3d at pp. 213, 215-216; *Stacy I, supra,* 36 Cal.App.4th at p. 1090.)

In *Rubin* v. *Green* (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044], our Supreme Court extended the protective policy of section 47(b) to embrace suits for injunctive relief, including those seeking to enjoin statutory violations. (4 Cal.4th at pp. 1201-1203 [holding that the privilege sweeps broadly to immunize an effort to enjoin an unfair business practice under Business and Professions Code section 17204].) In so holding, the court acknowledged the conflicting policies at play, namely, the policy of permitting citizens to police the spectrum of "unfair competition" and that of affording litigants open access to the courts. The court came down on the side of the privilege, exhorting that "[i]f the policies underlying section 47(b) are sufficiently strong to support an absolute privilege, the resulting immunity should not evaporate merely because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from the identical conduct as that protected by section 47(b)." (4 Cal.4th at p. 1203.)

 Defending the judgment, Stacy asserts that the section 47(b) shoe fits because the four *Silberg* criteria, quoted above, are met. We see it somewhat differently.

As we pointed out in *Stacy I,* filing the contract claim *fulfilled two independent functions and served dual purposes.* (*Stacy I, supra,* 36 Cal.App.4th at p. 1090.) First, the filing was called for under clause 89 of the contract and, according to President Stacy, it was submitted pursuant to the early advice of the City's project engineer. Indeed, Stacy was "directed" to submit its change order requests as a claim under the contract. This procedure had a life of its own wholly apart from any judicial action.

On the other hand, the contract claim followed on the heels of Stacy's presentation to the City of its Government Code claim[6] for material breaches of contract. Once that claim was "deemed rejected," Stacy initiated its breach of contract action for the alleged damages documented and detailed in the contract claim. In this sense the contract claim also served a litigation purpose.

Unquestionably, had Stacy not pursued litigation against the City, it still would have had to present the contract claim for overages in order to receive any compensation above the contractual amount. Once it submitted the contract claim, the City would have a good faith reciprocal obligation to review and evaluate the claim to determine whether the contractor was entitled to the additional compensation set forth therein.

Moreover, under the FCA, the prosecuting authority of a city or county *is obligated* to investigate diligently violations under the FCA—including the presentation of false claims—that involve that entity's funds. (§ 12652, subd. (b)(1).) Upon finding a violation, the prosecuting authority *may* bring a civil action. (*Ibid.*) Thus, even if Stacy had not sued the City, upon suspecting falsities in the claim, the City would have been obligated to undergo further investigation, with discretion to file its own suit. And, if the City failed to investigate, mandamus would lie to compel investigation and, in certain cases, perhaps to compel the exercise of discretion on the issue of whether to sue under the FCA or not. (Code Civ. Proc., §§ 1085, 1086.) Finally, the FCA is to "be liberally construed and applied to promote the public interest." (§ 12655, subd. (c).)

▮ Where, as here, a public contractor delivers a contract claim for overages according to the administrative procedures prescribed by the contract and the public agency, that claim does not become privileged simply because the contractor also anticipated suing the agency for the sums detailed in the contract claim. The paper trail of contractual performance and

---

[6]The claim was filed pursuant to section 900 et seq. This is part of what is commonly referred to as the "Tort Claims Act" found at section 810 et seq. (See *Wilson* v. *San Francisco Redevelopment Agency* (1977) 19 Cal.3d 555, 557 [138 Cal.Rptr. 720, 564 P.2d 872]; Cal. Government Tort Liability Practice (Cont.Ed.Bar 3d ed. 1992) § 2.1, pp. 69-70.) Under the act, and subject to certain exceptions not pertinent to this case, all claims for money or damages against a local public entity must be presented in accordance with the statutory provisions. (§§ 905, 945.4.) Among other things, the claim must show the date, place and other circumstances of the transaction giving rise to the asserted claim, as well as a general description of the obligation, injury or damages. (§ 910.) If, as was the case here, the amount of the claim exceeds $10,000, the claim shall not include a dollar amount. (*Ibid.*) It is only after the claim is acted upon or deemed to have been rejected by the governing body of the local entity that an action may be pursued in court. (§ 945.4.)

course of dealing between parties under a contract cannot be immunized from use in later judicial proceedings just because that paper trail is also a publication that serves a litigation purpose. If that same paper trail amounts to wrongful performance or conduct under the contract, it escapes section 47(b). The litigation privilege encompasses only the communicative act; it does not privilege tortious courses of conduct. (*Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 211 [271 Cal.Rptr. 191, 793 P.2d 524]; *Stacy I, supra,* 36 Cal.App.4th at p. 1091.)

Since the document in question wears both the conduct and publication hats, our task is more complicated than merely deciding whether the nonapplication of section 47(b) would dilute the healthy policy of crushing derivative tort actions. We must concern ourselves also with the rights, remedies and obligations of the other contracting party. These must be preserved, including rights and obligations emanating from the FCA. The litigation privilege was never meant to spin out from judicial action a party's performance and course of conduct under a contract.

## B. *The FCA Applies to the Contract Claim*

██ Amici curiae in support of Stacy[7] propose an alternative basis for affirming the judgment. They posit that "contract claims against public entities are expressly excluded from the application of the FCA." We disagree.

Section 12651, subdivision (e), creates an exception to the list of acts that would subject persons to treble damages for filing a false claim. It states: "This section does not apply to claims, records, or statements made pursuant to Division 3.6 (commencing with Section 810) of Title I . . . ." In other words, section 12651, subdivision (e) does not apply to claims under the Tort Claims Act.[8]

Amici curiae call our attention to what appear to be consultant reports prepared in advance of committee hearings on the initial bill that ultimately

---

[7]Amici curiae for Stacy are Associated General Contractors of California and Engineering and Utility Contractors Association.

[8]The FCA was added by Statutes 1987, chapter 1420, section 1, page 5237 et seq. It originated as Assembly Bill No. 1441, introduced by Assembly Member Floyd on March 4, 1987. The original version of the bill did not include the exception for claims filed under the Tort Claims Act.

became the FCA. They urge us to consider these documents as indicia of legislative intent.[9]

First, we seriously question whether these reports are "official acts" of the Legislature which qualify them for discretionary judicial notice pursuant to Evidence Code section 452, subdivision (c). Amici curiae cite no authority for such proposition, nor do they support the request with sufficient foundation to establish the credibility of the reports such that we could rely on them.[10] Second, we do not find these reports to be reliable indicators of legislative intent. The identity and qualifications of the author are not clearly spelled out, the purpose for which they were prepared is not clearly delineated nor is there any statement concerning the extent, if any, of the legislators' reliance thereon. Third, the language of section 12651, subdivision (e) is without ambiguity and we have no need to further explore the intent of its authors. In other words, courts are not concerned with why the Legislature acted but, rather, with what the Legislature enacted; when the latter is clear, the former is irrelevant.

Straight and simple: under section 12651, subdivision (e), Stacy's Government Code claim cannot serve as the basis for action under the FCA. However, also straight and simple, the contract claim is not the Government Code claim. First, it was lodged with the City separately, after Stacy had filed its Government Code claim. Second, the Government Code claim is an independent item, with statutory requirements governing its contents. (§ 910.) The contract claim does not begin to resemble the claim described in section 910. In particular, the section 910 claim must describe the damages or indebtedness *in general terms*, and where the claim is for more than $10,000, *no dollar amount should be included in the claim*. In contrast, the contract claim is comprised of pages and pages of detailed overages, with direct costs and indirect costs separately portrayed, numerous exhibits and a "preliminary quantum summary" showing a claim to date of $790,277.22. This claim was required under the contract and course of

---

[9]In particular, amici curiae refer us to two items that were judicially noticed below: (1) a report for the Assembly Committee on Judiciary hearing on Assembly Bill No. 1441, May 6, 1987, Elihu Harris, chair, page 3; and (2) a report for the Senate Committee on Judiciary hearing on Assembly Bill No. 1441, July 14, 1987, Bill Lockyer, chair, pages 4-5.

These reports (1) raise the question of the bill's possible chilling effect on persons who need to protect their potential claim of liability against the government by filing a claim under the Tort Claims Act at a time when that person does not have sufficient facts to accurately determine the correct amount of damages; and (2) indicate that proponents of the bill say it would not apply to claims filed under the Tort Claims Act or to litigation claims in general.

[10]The 11th hour amended request of amici curiae for this court to take judicial notice of these committee reports was denied for these reasons, without a determination of the standing of amici curiae to make the request.

dealing between the parties and, while it served a litigation purpose as well, it clearly was not a claim, record or statement made pursuant to the Tort Claims Act. (§ 12651, subd. (e).)

The judgment is reversed. Parties to bear their own costs on appeal.

Poché, J., and Hanlon, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 16, 1996.